[Nos. B208284, B208616. Second Dist., Div. Three. Dec. 11, 2008.]

GGIS INSURANCE SERVICES, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CAPITOL INDEMNITY CORPORATION, Real Party in Interest.

COUNSEL

Michelman & Robinson, Sanford L. Michelman, Todd H. Stitt, Barbara J. Mandell and Katherine A. Tatikian for Petitioners.

No appearance for Respondent.

Sedgwick, Detert, Moran & Arnold, Michael R. Davisson, Douglas Collodel, Michael M. Walsh, Valerie D. Rojas and Calvin S. Whang for Real Party in Interest.

OPINION

**CROSKEY, Acting P. J.**—GGIS Insurance Services, Inc. (GGIS), Insuresuite, Inc. (Insuresuite), Survival Insurance, Inc. (Survival), and Richard Joseph Acunto (collectively Petitioners) commenced this action against Capitol Indemnity Corporation (Capitol), alleging that it owed them a defense and indemnity in an action brought against them by the Pennsylvania insurance commissioner. Petitioners sought to stay this action on the ground any adjudication of facts in this proceeding could prejudice them in the underlying Pennsylvania action. They challenge the trial court's denial of their request for a stay. They also challenge the denial of their motion for summary adjudication of Capitol's claimed duty to defend.

We conclude that a policy exclusion precludes coverage for the claims alleged by the commissioner and that a stay is not warranted because the coverage issues can be decided as a matter of law. We therefore deny both petitions.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Factual Background*

GGIS is a California corporation that acts as a general agent in California for insurers. Acunto is its chief executive officer and a director. Insuresuite and Survival worked together with GGIS in some capacity.

GGIS marketed, underwrote, and serviced automobile insurance policies in California on behalf of Legion Insurance Company (Legion) and Villanova Insurance Company (Villanova), pursuant to a "Management Agreement." Acunto also was a party to the Management Agreement. The Management Agreement provided for GGIS to collect premiums paid by policyholders, retain a portion of those funds as commissions for services rendered, and

remit the remainder to Legion and Villanova. It provided that all premiums collected by GGIS were the property of Legion and Villanova, and that GGIS held those funds as a fiduciary. It stated further that GGIS was responsible for collecting all "earned premium" and for paying those amounts to Legion and Villanova "whether collected or not." The Management Agreement also provided for GGIS to "refund commissions on policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained."

The Commonwealth Court of Pennsylvania issued orders of rehabilitation in March 2002, appointing the Pennsylvania insurance commissioner as rehabilitator of Legion and Villanova. The court ordered all persons in possession of those insurers' assets not to dispose of the assets without the prior written consent of the commissioner. It also ordered all persons who had collected premiums on behalf of the insurers to "account for all earned premiums and commissions" and "account for and pay all premiums and commissions unearned due to policies canceled in the normal course of business, directly to the Rehabilitator." After it became aware of the rehabilitation orders, GGIS ceased retaining "commissions" from the premiums collected and instead retained "administrative fees" in the amount of $180,000 per week, beginning in April 2002. GGIS contends it collected those fees pursuant to an oral agreement with the commissioner. GGIS stopped retaining administrative fees in December 2002, when there were no more collected premiums. The Pennsylvania court issued orders of liquidation in July 2003, appointing the commissioner as liquidator of Legion and Villanova.

## 2. *The Insurance Policy*

Capitol issued an insurance agents and brokers professional liability policy to GGIS, as the named insured, for a one-year period beginning on December 31, 2004. The policy included "Insuring Agreements A and B," providing up to $3 million in coverage for losses and defense expenses arising from claims first made during the policy period. "Insuring Agreement C" provided limited coverage up to $25,000 for defense expenses only, in certain circumstances.

The policy exclusions stated that the policy "shall not apply to any **Claim, Loss, or Defense Expenses** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving," certain matters. The specified matters included, "any actual or alleged commingling of, or inability or failure to pay, collect, safeguard or return any money or failure to perform any actuarial service" (exclusion G).

A "**Claim**" was defined as:

"1. any written notice or demand for monetary relief; or

"2. any civil proceeding in a court of law, made against any **Insured** seeking to hold such **Insured** responsible for damages for a **Wrongful Act** or **Personal Injury**.

"A **Claim** does not include criminal proceedings of any type, or regulatory investigations or proceedings, or any proceeding that seeks injunctive, declaratory, equitable or nonpecuniary relief or remedies of any type."

A "**Wrongful Act**" was defined as "any actual or alleged negligent act, error or omission of an **Insured** arising solely from the **Insured**'s rendering or failing to render **Professional Services**."

### 3. *The Pennsylvania Action, Tender of Claim, and Payment of Defense Costs*

An attorney representing the Pennsylvania insurance commissioner, M. Diane Koken, sent a letter to GGIS and Acunto in March 2005, demanding remittance of over $6 million in premiums collected by them on behalf of Legion and Villanova and purportedly retained improperly as administrative fees. The letter also stated that GGIS had improperly paid to or for the benefit of reinsurers over $3.5 million of premiums collected. The letter stated further that GGIS and Acunto had miscalculated the amounts of "returned premium" due insureds upon the cancellation of certain policies and that the "insureds received overpayments of returned premium or failed to pay premium owed because Guardian did not perform the required short rate calculation," and demanded an accounting of those amounts. The letter demanded payment of over $9.5 million to the commissioner and an accounting of all premium amounts for the canceled policies.

GGIS filed a proof of claim in June or July 2005 in connection with the liquidation proceedings. GGIS alleged that Legion and Villanova had committed fraud, breach of fiduciary duty, and breach of contract by failing to disclose their precarious financial condition, and sought $10 million in damages.

The commissioner commenced an action against Petitioners by filing a writ of summons in the Commonwealth Court of Pennsylvania in July 2005. GGIS notified Capitol of the action in September 2005 and requested a defense. Capitol responded with a reservation of rights. Capitol later agreed

to pay GGIS's defense costs under Insuring Agreement C while reserving its rights to deny any right to coverage or to a defense under the policy.

The commissioner filed a complaint against Petitioners in December 2005 in Pennsylvania. The commissioner alleged that (1) she brought the action as liquidator of Legion and Villanova with the authority to collect the assets of, and pursue all claims belonging to, the insolvent insurers; (2) GGIS and Acunto marketed and sold insurance policies for Legion and Villanova pursuant to the Management Agreement and were required to remit to the insurers "both collected and uncollected premiums pertaining to those policies"; (3) all premiums collected by GGIS and Acunto were the sole property of the commissioner and were held in trust by GGIS and Acunto; (4) GGIS and Acunto "improperly retained earned and unearned premium amounts" that they "unilaterally denominated as administrative fees"; (5) the Management Agreement provided for GGIS and Acunto to bear their own administrative expenses, and that the agreement could be modified only in writing; (6) the chief financial officer of GGIS, Noshir Lackdawalla, acknowledged in August 2002 that GGIS had requested payment of $180,000 per week from the commissioner in addition to the compensation agreed upon under the Management Agreement, but that no agreement was reached; and (7) GGIS proceeded to retain the additional compensation unilaterally and transferred some of those funds to Acunto, Survival, and Insuresuite.

The commissioner alleged counts for (1) breach of contract, against GGIS and Acunto; (2) "return of premium trust funds" (capitalization omitted), against all Petitioners; (3) breach of fiduciary duty, against GGIS, Acunto, and Survival; (4) negligence, against GGIS, Acunto, and Survival; and (5) an accounting, against all Petitioners.

In her complaint, the commissioner alleged that GGIS and Acunto breached the Management Agreement "by failing and refusing to account for and remit premiums owed to Legion and Villanova," and that the commissioner suffered damages as a result (count one); Petitioners "have improperly been in or are presently in possession of premium trust funds that belong to the Liquidator," that they "failed to remit premium trust funds" to the commissioner, and that the commissioner suffered damages as a result (count two); GGIS, Acunto, and Survival breached their fiduciary duties owed to Legion, Villanova, and the commissioner "by failing to pay premiums, and improperly deducting credits and 'administrative fees' from amounts due," and that the commissioner suffered damages as a result (count three); GGIS, Acunto, and Survival "breached their duty of care by failing to pay premiums, and improperly withdrawing 'credits' and so-called 'administrative fees' from amounts due to Legion, Villanova, and the Liquidator," and that the commissioner suffered damages as a result (count four); and the Management

Agreement, rehabilitation orders, and liquidation orders impose a duty on Petitioners to provide the information necessary to substantiate the amounts remitted to the insurers and the commissioner or retained from those remittances, and that an accounting is necessary and appropriate to determine the amounts owed by Petitioners (count five).

The commissioner sought a judgment requiring Petitioners (1) "to remit all premiums, earned and unearned, all commissions due, all improperly withheld credits and fees, and all other monies they, or either of them, received arising from Legion and Villanova policies as required by the Rehabilitation Orders, Liquidation Orders and the [Management] Agreement"; (2) "to pay all outstanding premium due under Legion and/or Villanova policies of insurance"; (3) "to remit funds overfunded by Legion, Villanova, and/or the Liquidator for claims administration"; and (4) to produce all records necessary for an accounting to determine the amounts owed to Legion, Villanova, and the commissioner; and awarding such relief as the court deems appropriate, "including money damages against defendants in an amount in excess of $10,000,000 for all amounts owed to Legion, Villanova and the Liquidator, together with costs, including interest and attorneys' fees, according to law."

Capitol terminated its payment of defense costs in March 2006, after paying a total of $25,000 in defense costs.

### 4. *The Complaint in the Present Action*

Petitioners filed a complaint against Capitol and Darwin Professional Underwriters, Inc. (Darwin), in the present action in August 2006. They alleged that GGIS was the named insured under the policy, that Acunto was insured as a "principal, partner, officer, director, trustee and/or employee" of GGIS, and that Insuresuite and Survival were insured as solicitors, subagents, subbrokers, independent contractors, or partners of GGIS. Petitioners alleged that they were entitled to payment of up to $3 million in defense costs under Insuring Agreements A and B, and that Capitol's termination of their defense was unreasonable. They alleged counts against Capitol and Darwin for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory relief, requesting a declaration that defendants owe them a defense and indemnity; and (4) violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), seeking injunctive relief and restitution.

### 5. *Motions for Summary Judgment or Summary Adjudication and Request to Continue or Stay the Trial*

Capitol and Darwin moved for summary judgment or summary adjudication on each count alleged in Petitioners' complaint. They argued that the

only potential coverage under the policy was under Insuring Agreement C, that Capitol had paid the applicable $25,000 limit, and that Petitioners therefore could not establish liability under any of the counts alleged in the complaint. They also argued that exclusions G and M precluded any potential for coverage. Darwin argued further that, as Capitol's claims manager, it was not a party to the insurance contract and therefore could not be liable under any of the counts alleged in the complaint. Petitioners argued in opposition that there was a potential for coverage under Insuring Agreements A and B, that Insuring Agreement C and exclusions G and M were all inapplicable.

GGIS and Acunto moved for summary adjudication seeking to establish that Capitol owed them a duty to defend. They argued that the Pennsylvania action and the prior demand letter by the commissioner constituted a "claim," as defined in the policy, for which there was potential coverage and a duty to defend under Insuring Agreements A and B. They argued that Insuring Agreement C applied only to regulatory proceedings and was inapplicable because the commissioner was prosecuting the action in her capacity as liquidator rather than as a regulator. Capitol and Darwin argued in opposition that Insuring Agreements A and B were inapplicable, that the only potential coverage was under Insuring Agreement C, and that exclusions G and M precluded coverage.

Petitioners filed an ex parte application to continue the trial or stay the action on March 21, 2008, after the filing of the motions for summary judgment or summary adjudication but before the hearings on those motions. They requested, in the alternative, an order shortening time for a noticed motion seeking the same relief. They argued that defendants sought to adjudicate in this action facts and issues that are substantially identical to material facts and issues to be adjudicated in the Pennsylvania action, and that a continuance or stay was necessary to avoid prejudice to Petitioners in the Pennsylvania action. They argued that the issues that defendants sought to adjudicate in this action included the nature of Petitioners' agreement with the insurance commissioner regarding administrative fees, when a dispute first arose concerning funds retained by Petitioners pursuant to the agreement, and whether Petitioners improperly paid to reinsurers and insureds funds that should have been paid to the commissioner as liquidator. The trial court denied the ex parte application.

The trial court ruled on defendants' motions for summary judgment or summary adjudication in a minute order dated April 28, 2008. The court determined that Darwin was not a party to the insurance contract and granted summary judgment on the complaint in favor of Darwin. The order stated with regard to the breach of contract count against Capitol that there were triable issues of fact as to whether Insuring Agreement C applied. The order

also stated that there were triable issues of fact concerning the application of exclusion G: "As to Exclusion G, there are triable issues of fact as to the relationship of the Exclusion to the general terms of the policy, whether the services are actuarial, and whether there are other services in addition to actuarial which would be covered by the policy." The trial court therefore denied Capitol's motion for summary adjudication of the count for breach of contract. The court concluded, however, that a genuine dispute as to Capitol's liability under the policy precluded liability for breach of the implied covenant, and therefore it granted summary adjudication as to that count in Capitol's favor. The court also granted summary adjudication in favor of Capitol as to the counts for declaratory relief and violation of the unfair competition law.

The court ruled on the motion for summary adjudication by GGIS and Acunto in a minute order dated May 29, 2008. Regarding the question whether Insuring Agreement C applied, the order stated that the court had previously determined that there were triable issues of fact as to whether Insuring Agreement C applied. Regarding the question whether exclusion G applied, the order referred to the court's prior determination that there were "triable issues of fact with regard to reasonable expectations." The court denied the motion by GGIS and Acunto.

### 6. *Further Requests to Stay the Trial*

Petitioners included in their trial brief filed on May 22, 2008, a request to stay the trial of the indemnity issues until after the conclusion of the Pennsylvania action. Petitioners also requested a stay at the final status conference on May 30, 2008. The court declined to stay the trial.

### 7. *Petitions for Writ of Mandate*

Petitioners petitioned this court for a writ of mandate, challenging the denial of their requests to stay the trial (No. B208284). We stayed all proceedings in the trial court pending further consideration of the petition. GGIS and Acunto then filed a second petition for writ of mandate, challenging the denial of their motion for summary adjudication of a duty to defend (No. B208616). We consolidated the two writ proceedings and issued an order to show cause.

### *CONTENTIONS*

Petitioners contend (1) this action should be stayed so they will not be forced to litigate in this action facts and issues that will be adjudicated in the Pennsylvania action; (2) the existence and extent of a duty to indemnify

cannot be known until the Pennsylvania action is resolved, so this action should be stayed until that time; (3) the allegations of the third party complaint establish a potential for coverage under Insuring Agreement A and therefore create a duty to defend, and Insuring Agreement C is inapplicable; and (4) the order denying their motion for summary adjudication should be vacated because it fails to specify the evidence showing the existence of a triable issue of material fact and because the trial court failed to consider Petitioners' moving and reply papers.[1]

## *DISCUSSION*

### 1. *Stay of a Coverage Action*

■  An insurer or its insured may sue to determine whether the insurer has a duty to defend or indemnify its insured in an action by a third party. Such a coverage action may be framed as an action for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, or otherwise. A coverage action should not proceed, however, if it may result in *factual* determinations that would prejudice the insured in the third party action. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 301–302 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*); *Haskel, Inc. v. Superior Court* (1995) 33 Cal.App.4th 963, 979 [39 Cal.Rptr.2d 520].) In those circumstances, the coverage action should be stayed until the third party action is resolved. (*Montrose, supra*, at p. 301.) A coverage action may proceed only if "the coverage question is logically unrelated to the issues of consequence in the underlying case . . . ." (*Id.* at p. 302.)

The insured may be prejudiced by factual determinations in a coverage action that would support the third party's claim of liability. Those factual determinations may be binding on the insured in the third party action under the doctrine of collateral estoppel, or may create a possibility of inconsistent factual determinations. (*Montrose Chemical Corp. v. Superior Court (Canadian Universal Ins. Co.)* (1994) 25 Cal.App.4th 902, 910 [31 Cal.Rptr.2d 38].) Although such a risk of prejudice to the insured typically arises in a declaratory relief action, the risk is not limited to actions for declaratory relief. Rather, the risk is present whenever litigation between an insurer and its insured may result in factual determinations that would prejudice the insured in a third party action against the insured. Accordingly, the rule requiring a stay is not limited to declaratory relief actions.[2]

---

[1] We presume that the trial court considered all of the papers filed in connection with Petitioners' motion for summary adjudication, and Petitioners have not shown otherwise. Accordingly, we will not address this contention further.

[2] The trial court granted summary adjudication against the declaratory relief count, as we have stated. Petitioners do not challenge that ruling in this writ proceeding.

■ A stay is *not* required, however, if the court in the coverage action may resolve the coverage question as a matter of law without making any factual determinations that would prejudice the insured in the third party action. (See *Montrose, supra*, 6 Cal.4th at p. 305 (conc. opn. of Kennard, J.).) An insurer is entitled to judgment in its favor if the insurer can establish a lack of coverage based on either facts that the insured does not dispute or "facts unrelated to the issues in the liability action." (*Id.* at pp. 305–306.) If there are no triable issues of fact material to such a showing, the court may determine the absence of both coverage and a duty to defend by summary judgment. (*Id.* at p. 306.) It thus appears that a coverage action may proceed if the coverage issue is one of law or turns upon factual questions that are logically unrelated to the matters at issue in the underlying action.

### 2. *Duty to Defend*

■ A liability insurer has a duty to defend its insured if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. (*Scottsdale Ins Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655 [31 Cal.Rptr.3d 147, 115 P.3d 460] (*Scottsdale*); *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275–277 [54 Cal.Rptr. 104, 419 P.2d 168].) The facts need only "raise the possibility" that the insured will be held liable for covered damages. (*Montrose, supra*, 6 Cal.4th at p. 304.) An insurer has a duty to defend even if the claims against the insured are " 'groundless, false, or fraudulent.' " (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1086 [17 Cal.Rptr.2d 210, 846 P.2d 792].) "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." (*Montrose, supra*, at pp. 299–300.)

A duty to defend arises upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. (*Scottsdale, supra*, 36 Cal.4th at p. 655; *Montrose, supra*, 6 Cal.4th at pp. 298–300.) If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 48–49 [65 Cal.Rptr.2d 366, 939 P.2d 766].) If a duty to defend arises by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively. (*Id.* at p. 46.)

■ "[I]n an action wherein all the claims are at least potentially covered because they may possibly embrace some triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer has a duty to defend. (*Buss v. Superior Court, supra*, 16 Cal.4th at pp. 46–47.) 'This obligation is express in the policy's language. It rests on the

fact that the insurer has been paid premiums by the insured for a defense. "The rule is grounded in basic principles of contract law." [Citation.] The duty to defend is contractual. [Citations.] "An insurer contracts to pay the entire cost of defending . . . claim[s]" that are at least potentially covered.' (*Id.* at p. 47.) [¶] By contrast, in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 47.) 'This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for a defense. This "rule" too "is grounded in basic principles of contract law." [Citation.] As stated, the duty to defend is contractual. "The insurer has not contracted to pay defense costs" for claims that are not even potentially covered.' (*Ibid.*)" (*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 59 [70 Cal.Rptr.2d 118, 948 P.2d 909].)

"From these premises, the following may be stated: If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (*Scottsdale, supra,* 36 Cal.4th at p. 655.)

### 3. *Rules of Policy Interpretation*

■ We interpret an insurance policy using the same rules of interpretation applicable to other contracts. (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].) The mutual intention of the contracting parties at the time the contract was formed governs interpretation. (Civ. Code, § 1636; *Palmer, supra,* at p. 1115.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (Civ. Code, §§ 1639, 1647.) We consider the contract as a whole and interpret its language in context, rather than interpret a provision in isolation. (*Id.,* § 1641.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id.,* § 1644.) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id.,* § 1638.)

■ Policy language is ambiguous if it is susceptible of more than one reasonable interpretation in the context of the policy as a whole.

(*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) In determining whether policy language is ambiguous, we consider not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641].) Even apparently clear policy language may be ambiguous when read in the context of the policy and the circumstances of the case. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246 [37 Cal.Rptr.3d 918].) Policy language cannot be found to be ambiguous in the abstract, however, and courts will not strain to create an ambiguity where none exists. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Whether policy language is ambiguous is a question of law that we determine de novo. (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920]; *American Alternative Ins. Corp., supra,* at p. 1245.)

Any ambiguity in policy language must be resolved in a manner consistent with the objectively reasonable expectations of the insured in light of the nature and kind of risks covered by the policy. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 869 [77 Cal.Rptr.2d 107, 959 P.2d 265].) Accordingly, an insuring clause is interpreted broadly, and an exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 648; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) " 'The exclusionary clause "must be conspicuous, plain and clear." ' [Citation.]" (*MacKinnon, supra,* at p. 648, italics omitted.) The interpretation of a contract, including the resolution of any ambiguity, is solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

4. *Capitol Has No Duty to Defend the Pennsylvania Action Because Exclusion G Precludes Coverage for the Commissioner's Claims*

Both parties contend there are no triable issues of fact concerning the existence of a duty to defend and the question should be decided as a matter of law. We agree. We need not resolve the dispute concerning the scope of the insuring clauses, or whether the facts establish a "claim" arising from a "wrongful act" within the meaning of the policy, because we conclude that exclusion G applies and precludes any potential coverage for the commissioner's claims.

The policy exclusions appeared in a separate section prominently headed "**EXCLUSIONS**." This section stated that the policy "shall not apply to any **Claim, Loss,** or **Defense Expenses** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving," certain matters. The specified matters included, "any actual or alleged commingling of, or inability or *failure to pay*, collect, safeguard or return *any money* or failure to perform any actuarial service" (exclusion G). (Italics added.)

Exclusion G clearly and conspicuously precludes coverage for any liability or defense costs arising from GGIS's failure to pay money. The factual allegations in the commissioner's complaint and the bases for Petitioners' alleged liability all involve the alleged failure to pay the commissioner either premiums collected from the insureds or uncollected premiums due the insurers under the terms of the Management Agreement, including administrative fees retained from the collected premiums, amounts paid to third parties from the collected premiums, and amounts overpaid to insureds upon policy cancellation. All of the counts alleged in the commissioner's complaint, including the counts for damages and the count for an accounting, arise from the alleged failure to pay to the commissioner money due the insurers. Absent a potential for coverage, Capitol has no duty to defend Petitioners in the Pennsylvania action.

■ Petitioners cite several out-of-state cases in which the courts strictly construed exclusions of claims for "premiums," "return premiums," "failure to collect, pay or return premiums," and the like. (*Utica Mut. Ins. Co. v. Impallaria* (1st Cir. 1989) 892 F.2d 1107, 1114–1115; *Pattison v. Employers Reinsurance Corp.* (6th Cir. 1990) 900 F.2d 986, 988–989; *Fremont Indem. Co. v. Lawton-Byrne-Bruner Ins.* (Mo.Ct.App. 1985) 701 S.W.2d 737, 743; *Otteman v. Interstate Fire & Cas. Co., Inc.* (1961) 172 Neb. 574 [111 N.W.2d 97, 100].) In contrast to those narrow provisions, exclusion G expressly precludes coverage for any claims based on the failure to pay any money and, in our view, unambiguously excludes the commissioner's claims from coverage.

We therefore conclude that the denial of Petitioners' motion for summary adjudication was proper, regardless of the trial court's stated reasons for denying the motion.[3] (*Monticello Ins. Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1385 [76 Cal.Rptr.3d 848].)

As we resolve the issue of Capitol's coverage liability to Petitioners *as a matter of law*, there is no need or reason to stay this action. Upon remand,

---

[3] The trial court's failure to specifically refer to the evidence indicating that a triable issue of material fact exists as required by Code of Civil Procedure section 437c, subdivision (g) is moot in light of our conclusion that Petitioners necessarily are not entitled to summary adjudication.

Capitol may renew its motion for summary judgment which, in light of the record before us and our decision in this matter, should be granted.

## *DISPOSITION*

The petitions are denied. Capitol is entitled to recover its costs in these appellate proceedings.

Kitching, J., and Aldrich, J., concurred.

Petitioners' petition for review by the Supreme Court was denied February 18, 2009, S169206. George, C. J., did not participate therein.