184 Cal.App.4th 285 (2010)
LEGACY VULCAN CORP., Petitioner,
v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TRANSPORT INSURANCE COMPANY, Real Party in Interest.
No. B215713.
Court of Appeals of California, Second District, Division Three.
April 30, 2010.
*289 Covington & Burling, Donald W. Brown, Wendy L. Feng and Stephen E. George for Petitioner.
No appearance for Respondent.
Duane Morris, Ray L. Wong, Paul J. Killion, Michael J. Dickman and Cyndie M. Chang for Real Party in Interest.

OPINION
CROSKEY, J.
In this case, we consider the nature of an insurer's defense obligations under a policy of liability insurance that provides both "excess" and "umbrella" coverage. In addition, we discuss the scope and extent of an insurer's duty to defend in spite of a "retained limit" on the insurer's duty to indemnify.
Legacy Vulcan Corp. (Vulcan) petitioned this court for a writ of mandate, challenging a pretrial order that decided three stipulated legal questions concerning the scope of the duty to defend under a liability insurance policy issued by Transport Insurance Company (Transport). The trial court concluded that the policy provided both excess and umbrella coverage, but that, for purposes of the duty to defend, Transport's obligations were limited to those of an excess insurer. Specifically, the trial court concluded that a duty to defend could arise under the terms of the policy only upon the exhaustion of all underlying insurance. It also held that a duty to defend could arise only upon a showing that the claims were "actually covered" under the policy.
We conclude that the umbrella coverage was primary coverage and that the existence of a duty to defend with respect to that coverage did not depend on *290 the exhaustion of any underlying insurance. The term "underlying insurance," as used in the provision establishing a duty to defend with respect to the umbrella coverage, is ambiguous; it must be interpreted in Vulcan's favor to encompass only the underlying policies described in a schedule attached to the Transport policy, rather than all of the collectible primary insurance available to Vulcan. Moreover, Vulcan need not show that the claims were actually covered under the Transport policy in order to establish a duty to defend with respect to the primary coverage provided by the umbrella provision, but need only show a potential for coverage.
We also conclude that a "retained limit" or "self-insured retention" provision in a policy providing primary coverage relieves the insurer of the duty to provide an immediate, "first dollar" defense only if the policy expressly so provides. Thus, Vulcan need not have incurred a liability in excess of the "retained limit" described in the Transport policy before the insurer's duty to defend could arise. We therefore will grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND

1. Insurance Policy Provisions[1]
Vulcan manufactured and sold perchloroethylene. Transport issued liability insurance policies to Vulcan for several years, including an excess catastrophe liability policy effective from January 1, 1981, to January 1, 1982. Under the terms of that policy, Transport agreed to indemnify Vulcan for the "ultimate net loss in excess of the retained limit" that Vulcan became legally obligated to pay as damages because of personal injury, property damage or advertising injury. Transport also agreed to defend any lawsuit "seeking damages on account of such personal injury, property damage or advertising injury, even if any of the allegations of the suit are groundless," if certain conditions were satisfied.
The insuring agreement stated, in relevant part:
"The Company will indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages because of
"A. personal injury or
"B. property damage or
*291 "C. advertising injury
"to which this insurance applies, caused by an occurrence, and
"(1) With respect to any personal injury, property damage or advertising injury not within the terms of the coverage of underlying insurance but within the terms of coverage of this insurance; or
"(2) If limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury during the period of this policy[2]
"The Company will
"(a) have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury, property damage or advertising injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient; but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the Company's limit of liability has been exhausted by payment of judgments or settlements." (Italics added.)
The declarations stated that the retained limit was "Underlying Insurance" or: "ITEM 3. $100,000 because of personal injury, property damage or advertising injury [¶] arising out of any one occurrence not within the terms of coverage of underlying insurance but within the terms of the coverage of this insurance."
The policy stated further under the heading "RETAINED LIMITTHE COMPANY'S LIMIT OF LIABILITY" that Transport's limit of liability was the "ultimate net loss in excess of the Insured's retained limit defined as the greater of: (a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured; or [¶] (b) the amount specified in Item 3. of the Limits of Liability section of the declarations because of personal injury, property damage or advertising injury not within the terms of the coverage of the underlying insurance listed in Schedule A."[3] (Italics added.)
"Ultimate net loss" was defined in the policy, generally, as the amount actually paid or payable for Vulcan's liability, excluding "all loss expenses *292 and legal expenses," such as attorney fees. The term "underlying insurance" was undefined. A policy endorsement, however, set forth a schedule of underlying insurance (entitled Schedule A) listing several insurance policies and stating the limits of liability for each policy.
The policy stated under the heading "Other Insurance": "If collectible insurance with any insurer is available to the Insured covering a loss also covered hereunder, the insurance hereunder shall be in excess of, and not contribute with, such other insurance provided, however, this does not apply to insurance which is written as excess insurance over the Company's limit of liability provided in this policy. [¶] When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below . . . ."

2. Underlying Actions

The City of Modesto and others sued Vulcan in three actions, alleging that use of perchloroethylene by the dry cleaning industry had resulted in environmental contamination. Vulcan tendered its defense to several insurers, but none provided a defense. Vulcan paid for its own defense and settled the lawsuits.

3. Present Actions

Transport filed a complaint against Vulcan for declaratory relief as to the parties' rights and obligations under the policy. Transport alleges in its complaint that it agreed to defend Vulcan under the terms of the policy only as to losses that were actually covered under the policy and only if and after Vulcan established a right of indemnity.[4] Other insurers commenced a separate action by filing another complaint against Vulcan for declaratory relief.[5] The trial court consolidated the two actions and designated the consolidated case as complex. Vulcan filed a cross-complaint against Transport and other insurers for breach of contract and declaratory relief.
Vulcan and Transport stipulated that the trial court could decide specified legal questions before trial. The first question concerned the meaning of the phrase in clause (1) "within the terms of coverage of this insurance." The *293 second focused on the meaning of the term "underlying insurance," which was used in several provisions of the policy. The third related to the application of the principles of horizontal exhaustion with respect to Transport's duty to defend.
The trial court answered those questions as follows:
(1) "The wording `within the terms of coverage of this insurance' means that, under the circumstances of this case, a suit must be shown to be actually covered by this policy for the provisions to apply. If the defense obligations were `payable' under the terms of the primary policy, there is no duty to defend under the terms of the Transport policy." The trial court stated further: ". . . Transport's duty to defend does not necessarily extend to any suit making claims that are merely potentially covered (it will be Vulcan's burden to establish at trial that the applicable underlying insurance has actually been exhausted). Absent a showing that there is no other primary coverage is [sic] available, Transport has no duty to defend under the policy."
The trial court explained that clause (1) was an umbrella provision and clause (2) an excess provision. The court stated that absent an express provision to the contrary, an excess insurer has no duty to defend unless the primary coverage has been exhausted. The Transport policy provided indemnity coverage only in excess of the underlying insurance, and Vulcan's liability could be "within the terms of coverage of this insurance," as stated in clause (1), only after the exhaustion of the underlying insurance. The court further stated, "[u]nder the Court's reading of the Insuring Agreement, the requirement that the underlying suit fall `within the terms of coverage of this insurance' means there must be actual coverage before the duty to defend is triggered-especially in light of the posture of this case (i.e., the fact the Modesto litigation settled prior to Vulcan's tender)." The court concluded, "The settlement of the underlying claims and the fact that the defense of the claims is complete is significant. The Court determines the issues with respect to the duty to defend in this context, and not in the context of a tender of pending claims."
(2) "The term `underlying insurance' refers to any underlying primary or SIR [self-insured retention] insurance for continuous losses, any portion of which occurred during the policy periods during which the Transport policy was in effect."
The trial court reasoned that absent an express provision to the contrary, an excess insurer has no duty to indemnify or defend until all of the underlying policies in effect at any time during the period of a continuous loss are exhausted. It stated that because the policy did not expressly define the term *294 "underlying insurance" to include only those policies listed in Schedule A, that term should be interpreted to include all primary policies in effect at any time during the period of a continuous loss. The court stated further that if any self-insured retention "provided primary coverage for continuous losses," the self-insured retention must be exhausted before any duty to defend could arise under the Transport policy.
(3) "[A]ll of the underlying coverage would have to be exhausted before Transport's defense obligations are triggered, pursuant to the horizontal exhaustion rule. As such, the Court determines that Transport can rely on principles of horizontal exhaustion before its duty to defend is triggered under the applicable Transport policy."
Vulcan filed a request for clarification of the trial court's answer to the first question. Vulcan argued that it appeared that the court had relied on unsubstantiated statements of fact in Transport's brief to the effect that Vulcan had failed to tender its defense to Transport until after the underlying actions were settled. Vulcan argued that any factual or legal questions concerning its tender of defense were reserved for trial, that the parties had not stipulated to any pretrial resolution of those issues, and that the court should not rely on such purported facts in interpreting the policy. Vulcan argued further that no formal tender of the defense was necessary in order to trigger the duty to defend. Vulcan also argued that the fact that the underlying actions had been settled, so there was no ongoing defense obligation, should have no bearing on the proper interpretation of the policy with respect to the duty to defend. Vulcan requested "clarification" of the court's ruling in these regards.

4. Petition for Writ of Mandate and Subsequent Events

Vulcan petitioned this court for a writ of mandate, challenging the order of April 9, 2009. We determined that the matter deserved immediate appellate review and issued an order to show cause.
Transport filed an opposition to Vulcan's request for clarification after the petition for writ of mandate was filed. The trial court stated, in a status conference on May 12, 2009, that it would not modify its prior order. The court stated further in a "Status Conference Agenda" served on that same date, (1) "The Court views the scope of the SIR as defined by the terms of the policy, including the terms of the self-retention agreement" and (2) "The Court's interpretation [of] `within the terms of coverage of this insurance' is based on the policy language and the fact that defense costs claimed are `fixed' by virtue of the settlement of the underlying City of Modesto cases, and further that there is no continuing and present duty to defend issue present in this case."

*295 CONTENTIONS

Vulcan contends (1) the duty to defend in clause (1) relates to the policy's umbrella coverage and extends to suits that are potentially covered under the Transport policy, so Vulcan need not show that a suit is actually covered in order to trigger a duty to defend; (2) the term "underlying insurance" as used in clause (1) includes only the underlying policies listed in Schedule A, rather than all primary policies in effect during the period of a continuous loss; and (3) the duty to defend in clause (1) does not depend on the exhaustion of any underlying insurance, so principles of horizontal exhaustion are inapplicable.

DISCUSSION

1. Rules of Policy Interpretation

(1) We interpret an insurance policy using the same rules of interpretation applicable to other contracts. (Powerine Oil Co., Inc. v. Superior Court (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589] (Powerine).) Our goal is to give effect to the mutual intention of the contracting parties at the time the contract was formed. (Civ. Code, § 1636; Powerine, supra, at p. 390.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (Civ. Code, §§ 1639, 1647.) We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation. (Id., § 1641.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (Id., § 1644.) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (Id., § 1638.)
(2) "Policy language is ambiguous if it is susceptible of more than one reasonable interpretation in the context of the policy as a whole. (MacKinnon v. Truck Ins. Exchange (2003) 31 Cal.4th 635, 648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) Whether policy language is ambiguous is a question of law that we review de novo. (Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920]; American Alternative Ins. Corp. v. Superior Court (2006) 135 Cal.App.4th 1239, 1245 [37 Cal.Rptr.3d 918].) Any ambiguity must be resolved in a manner consistent with the objectively reasonable expectations of the insured in light of the nature and kind of risks covered by the policy. (Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 869 [77 Cal.Rptr.2d 107, 959 P.2d 265].)" (State Farm General Ins. Co. v. Mintarsih (2009) 175 Cal.App.4th 274, 283 [95 Cal.Rptr.3d 845].) Moreover, any provision that *296 limits coverage reasonably expected by the insured under the policy terms must be conspicuous, plain and clear to be effective. (Haynes v. Farmers Ins. Exchange (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381] (Haynes); Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, 272-273 [54 Cal.Rptr. 104, 419 P.2d 168] (Gray).) Contract interpretation, including the resolution of any ambiguity, is solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence. (Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

2. Primary, Excess and Umbrella Coverage

(3) Primary insurance provides coverage immediately upon the occurrence of a loss or an event giving rise to liability, while excess insurance provides coverage only upon the exhaustion of specified primary insurance. (Century Surety Co. v. United Pacific Ins. Co. (2003) 109 Cal.App.4th 1246, 1255 [135 Cal.Rptr.2d 879].) Insurance policies sometimes include both excess and umbrella insurance. Umbrella insurance provides coverage for claims that are not covered by the underlying primary insurance. (Powerine, supra, 37 Cal.4th at p. 398, fn. 9.) An umbrella insurer "drops down" to provide primary coverage in those circumstances. (Id. at p. 398 & fn. 9; Reserve Insurance Co. v. Pisciotta (1982) 30 Cal.3d 800, 812 [180 Cal.Rptr. 628, 640 P.2d 764].) Thus, a policy that provides both excess and umbrella insurance provides both excess and primary coverage. The policy issued by Transport was such a policy.
The policy's insuring agreement stated that Transport would indemnify Vulcan against liability for damages in excess of the "retained limit." The policy defined "retained limit" for purposes of the indemnity obligation as the greater of the limits of liability of "any other underlying insurance" (clause (a); see fn. 3, ante) or the amount specified in the declarations as to Vulcan's liability "not within the terms of the coverage of the underlying insurance listed in Schedule A" (clause (b); see fn. 3, ante). Essentially, when read in conjunction with the insuring agreement, clause (a) provided excess coverage and clause (b) provided primary umbrella coverage.
Clause (a) expressly provided for coverage in excess of all underlying insurance, and therefore provided excess coverage. Clause (b), in contrast, provided for coverage of claims "not within the terms of the coverage of the underlying insurance listed in Schedule A." (Italics added.) In our view, this quoted phrase refers to the fact of coverage rather than the extent of coverage. In other words, if the underlying insurance listed in Schedule A provided no coverage for a particular claim (as distinguished from coverage that had been exhausted), and the claim was within the scope of the Transport *297 policy, the Transport policy provided coverage for the claim. This interpretation is consistent with the rule that a contract should be interpreted so as to give effect to each provision. (Civ. Code, § 1641.) To interpret clause (b) as providing for coverage only upon the exhaustion of the underlying insurance listed in Schedule A would make it duplicative of clause (a) and render it surplusage. Moreover, it would be contrary to the express provisions of clause (b).
Clause (b) provided coverage for claims where the specified underlying policies provided no coverage. It therefore provided umbrella coverage. This umbrella coverage constituted primary coverage.[6]

3. Transport Had a Duty to Defend Claims Potentially Covered by the Umbrella Coverage

a. The Rules Regarding a Duty to Defend in Connection with Primary Coverage Apply to Primary Umbrella Coverage

The Transport policy expressly provided a duty to defend in connection with both the excess and the umbrella coverage. The insuring agreement stated that Transport had the right and duty to defend any suit against Vulcan seeking damages for personal injury, property damage, or advertising injury if the damages were not within the terms of coverage of "underlying insurance" but were "within the terms of coverage of this insurance" (clause (1)). It stated that Transport also had the right and duty to defend any suit against Vulcan seeking damages for personal injury, property damage or advertising injury if the limits of liability of "the underlying insurance" were exhausted because of personal injury, property damage, or advertising injury during the Transport policy period (clause (2)). The policy did not state that the duty to defend under clause (1) was limited in any manner by the "retained limit" provisions in the policy, which expressly governed only Transport's indemnity obligation.
(4) Clause (1) established a duty to defend in connection with the umbrella coverage. Because the umbrella coverage was primary rather than excess coverage, the ordinary rules regarding a duty to defend in connection with primary liability coverage apply.
(5) A duty to defend arises if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. *298 (Scottsdale Ins. Co. v. MV Transportation (2005) 36 Cal.4th 643, 654-655 [31 Cal.Rptr.3d 147, 115 P.3d 460] (Scottsdale); Gray, supra, 65 Cal.2d at pp. 275-277.) The facts need only "raise the possibility" that the insured will be held liable for covered damages. (Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 304 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (Montrose).) The insurer has a duty to defend even if the claims against the insured are "`groundless, false, or fraudulent.'"[7] (Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1086 [17 Cal.Rptr.2d 210, 846 P.2d 792].) "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." (Montrose, supra, at pp. 299-300.)
(6) "A duty to defend arises upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. (Scottsdale, supra, 36 Cal.4th at p. 655; Montrose, supra, 6 Cal.4th at pp. 298-300.) If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (Buss v. Superior Court (1997) 16 Cal.4th 35, 48-49 [65 Cal.Rptr.2d 366, 939 P.2d 766].) If a duty to defend arises by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively. (Id. at p. 46.)" (GGIS Ins. Services, Inc. v. Superior Court (2008) 168 Cal.App.4th 1493, 1505 [86 Cal.Rptr.3d 515].) Thus, the fact that the underlying actions were settled has no impact on the existence of a duty to defend if such a duty arose before the settlements.
(7) "If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (Scottsdale, supra, 36 Cal.4th at p. 655.)
(8) We hold that these principles are fully applicable to the umbrella coverage provided by the Transport policy. The application of these rules to this case makes it clear that Vulcan need not show that a claim was actually covered by the policy in order to establish a duty to defend with respect to the umbrella coverage. Instead, Transport had a duty to defend with respect to the umbrella coverage under clause (1) if any of the claims was potentially covered by the policy and were not within the terms of coverage of "underlying insurance."
*299 The trial court apparently interpreted the language "within the terms of coverage of this insurance" in clause (1) to mean "within the terms of excess coverage of this insurance," so the defense obligation with respect to the umbrella coverage could apply only upon the exhaustion of the underlying insurance. But clause (2) established the defense obligation with respect to the excess coverage. Adoption of the trial court's interpretation of clause (1) would make the duty to defend with respect to the umbrella coverage coextensive with the duty to defend with respect to the excess coverage. Such an interpretation renders clause (1) surplusage and effectively negates the duty to defend with respect to the umbrella coverage. Accordingly, we conclude that the construction of the policy adopted by the trial court was incorrect.[8]

b. The Term "Underlying Insurance" As Used in Clause (1) Is Ambiguous

Clause (1) referred to "underlying insurance" without qualification. The same is true of clause (2), as well as "Item 3" (set forth in the policy's declarations and referred to in the "retained limit" provision of the policy). But clause (a) of the "retained limit" provision, in contrast, referred more explicitly to "the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured," and clause (b) of that provision qualified its reference to "the underlying insurance" by limiting it to the policies "listed in Schedule A." This raises the critical question as to whether the unqualified reference to "underlying insurance" in clause (1) encompassed only the underlying insurance listed in Schedule A or all underlying insurance that was collectible by Vulcan.
Clause (a) used the term "underlying insurance" in a generic sense and expressly qualified the term by referring to both "the underlying insurance listed in Schedule A" and "any other underlying insurance collectible by the Insured." This suggests that the term "underlying insurance" as used in the policy is a generic term that, absent an explicit qualification, is neither limited to the underlying insurance listed in Schedule A nor encompasses all underlying insurance. Clause (1), however, referred to "underlying insurance" without qualification. The references to "the underlying insurance" in clause (2) and "underlying insurance" in "Item (3)" do not meaningfully inform or clarify the scope of the term "underlying insurance" as used in clause (1).
*300 Clause (b) established an indemnity obligation with respect to the umbrella coverage, while clause (1) established a defense obligation with respect to that coverage, as we have stated. The indemnity obligation under clause (b) extended to claims for which "the underlying insurance listed in Schedule A," rather than all underlying insurance, provided no coverage. In our view, it was objectively reasonable for Vulcan to conclude, with respect to the umbrella coverage, that the claims for which clause (1) provided a defense obligation were the same claims for which clause (b) provided an indemnity obligation, absent language clearly stating to the contrary. Given the policy language, Vulcan would reasonably expect Transport to provide a defense for all claims potentially covered by the policy's umbrella provision.
Reading clause (1) in the context of the policy as a whole, we believe that the term "underlying insurance" as used in clause (1) is ambiguous because it reasonably could be interpreted to mean either the insurance listed in Schedule A only or all underlying insurance collectible by Vulcan. Resolving this ambiguity in accordance with the objectively reasonable expectations of the insured, as we must (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th 857, 869), we conclude that the term "underlying insurance" as used in clause (1) encompasses only the policies listed in Schedule A.

4. The Self-insured Retention Did Not Limit the Duty to Defend

(9) Transport contends City of Oxnard v. Twin City Fire Ins. Co. (1995) 37 Cal.App.4th 1072 [44 Cal.Rptr.2d 177] (City of Oxnard) and General Star Indemnity Co. v. Superior Court (1996) 47 Cal.App.4th 1586 [55 Cal.Rptr.2d 322] (General Star) establish a rule that an insurer has no duty to defend until the insured has become legally obligated to pay an amount in excess of any self-insured retention in the policy. In our view, there is no such general rule that is applicable without regard to the particular provisions of the policy. Instead, the impact of a policy reference to a "self-insured retention" or "retained limit" on the duty to defend depends on the particular policy language.
A "self-insured retention," or "retained limit," generally refers to the amount of a loss or liability that the insured agrees to bear before coverage can arise under the policy. Although a self-insured retention ordinarily differs from a deductible in some respects, the term "self-insured retention" or "retained limit" in an insurance policy can reasonably connote to the insured no more than what is expressly stated in the policy.[9] In other words, these *301 terms alone are not sufficient to convey to an unsophisticated insured an understanding of what an insurance expert or attorney might believe to be the essence of a self-insured retention. Any limitation on coverage otherwise available under the policy "must be stated precisely and understandably, in words that are part of the working vocabulary of the average layperson. [Citation.]" (Haynes, supra, 32 Cal.4th at p. 1204.)
City of Oxnard, supra, 37 Cal.App.4th 1072, involved two policies that "expressly stated that only `excess' insurance was being provided, and such coverage was only available after [the insured] became legally obligated for a loss in excess of its retained limit or SIR." (Id. at p. 1075.) City of Oxnard stated, "Both policies contained numerous, unambiguous references to the nature of the instant coverage as excess insurance. Also, by the very nature of these policies wherein Oxnard agreed to insure itself for certain amounts, it expressly agreed to act as its own primary insurer under those retained limits. [Citation.]" (Id. at p. 1077.) The opinion did not quote the policy language in this regard, so it is not clear in what manner, if at all, that language differed from the typical self-insured retention provision promising coverage for amounts "in excess of" the retained limit, or whether the policies expressly stated that the insurers had no duty to defend unless the self-insured retention was exhausted. City of Oxnard stated that an excess insurer has no duty to defend unless the primary insurance is exhausted, and that the insurers therefore had no duty to defend because the liability did not exceed the retained limit. (Id. at pp. 1077-1078.)
General Star, supra, 47 Cal.App.4th 1586, involved a policy with standard commercial general liability forms and a self-insured retention endorsement stating that the limits of liability set forth in the policy declarations "`shall apply in excess of your Self-Insured Retention.'" (Id. at p. 1590.) The endorsement expressly stated that the insurer had no duty to defend unless the retained limit was exhausted. (Ibid.) General Star stated that the endorsement "effectively transforms the policy from a primary policy into an excess policy covering only amounts in excess of the $100,000 self-insured retention. [Citation.]" (Id. at p. 1593.) General Star stated that City of Oxnard, supra, 37 Cal.App.4th 1072, "is on point" and that "Oxnard had policies excess of SIR's by which Oxnard agreed to insure itself up to the level of the SIR." (General Star, supra, at p. 1593.) General Star stated that City of Oxnard held that the insurer had no duty to defend because the "`primary coverage' "of the self-insured retention was not exhausted. (General Star, supra, at *302 p. 1593.) General Star also stated that the plain language of the endorsement at issue precluded any duty to defend unless the self-insured retention was exhausted. (Id. at p. 1594.)
(10) It is well settled that an excess insurer has no duty to defend unless the underlying primary insurance is exhausted, absent policy language to the contrary. (Signal Companies, Inc. v. Harbor Ins. Co. (1980) 27 Cal.3d 359, 368-369 [165 Cal.Rptr. 799, 612 P.2d 889]; Community Redevelopment Agency v. Aetna Casualty & Surety Co. (1996) 50 Cal.App.4th 329, 338 [57 Cal.Rptr.2d 755].) One of the reasons for this rule is that the defense obligation falls on the primary insurer, whose greater premium reflects that risk. (Signal, supra, at p. 365.) "[I]t is unnecessary to impose an immediate duty to defend on the excess carrier to afford the insured that to which it is entitled, namely, the full protection of a defense on its behalf." (Id. at p. 367.) Another reason for the rule is that, absent policy language to the contrary, the insured could have no reasonable expectation that an excess insurer would provide a defense before the primary insurance is exhausted. (Id. at p. 369.)
(11) These reasons do not support extending the rule that an excess insurer has no duty to defend unless the underlying primary insurance is exhausted to insurers who provide primary coverage with a self-insured retention, absent clear policy language so providing. So-called "self-insurance" is no insurance and affords the insured no protection at all. (Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 72, fn. 20 [70 Cal.Rptr.2d 118, 948 P.2d 909] (Aerojet-General).)[10] To require the exhaustion of a self-insured retention before an insurer will have a duty to defend would not ensure that the defense obligation rests on the insurer receiving premiums for that risk, but instead would result in no insurer *303 providing a defense prior to exhaustion. Moreover, in the absence of clear policy language so providing, to require the exhaustion of a self-insured retention before an insurer will have a duty to defend would be contrary to the reasonable expectations of the insured to be provided an immediate defense in connection with its primary coverage. If, under the terms of the policy, the insured would have a reasonable expectation that the insurer would provide a defense, any limitation on the insurer's defense obligation must be conspicuous, plain and clear. (Haynes, supra, 32 Cal.4th at p. 1204; Gray, supra, 65 Cal.2d at pp. 272-273.)
Montgomery Ward & Co. v. Imperial Casualty & Indemnity Co. (2000) 81 Cal.App.4th 356 [97 Cal.Rptr.2d 44] (Montgomery Ward) is instructive. Montgomery Ward involved several successive comprehensive general liability policies with self-insured retentions. Montgomery Ward held that principles of horizontal exhaustion did not apply to the self-insured retentions, meaning that all of the self-insured retentions applicable during the period of a continuous loss need not be exhausted before coverage could arise under the policies. (Id. at pp. 364-370.) Distinguishing the policy language at issue from that in General Star, supra, 47 Cal.App.4th 1586, and City of Oxnard, supra, 37 Cal.App.4th 1072, Montgomery Ward concluded that the policies at issue were not excess policies and that the self-insured retentions were not primary insurance for purposes of the horizontal exhaustion rule. (Montgomery Ward, at pp. 365-368.)
Montgomery Ward also discussed the duty to defend with respect to one of the insurers, and held that the self-insured retention in that insurer's policy was not primary insurance for purposes of the duty to defend. (Montgomery Ward, supra, 81 Cal.App.4th at pp. 373-375.) The policy expressly stated that the insurer had a duty to defend any claim within the coverage of the policy where such claim was not covered by any underlying insurance. (Id. at pp. 373-374.) Montgomery Ward interpreted this provision to mean that the duty to defend was not limited by the self-insured retention and that the insurer owed a "first dollar" duty to defend. (Id. at p. 374.) Montgomery Ward stated that to the extent that there was any ambiguity in the policy language regarding the defense duty, the ambiguity should be resolved in favor of the insured. (Id. at p. 375.)
Clause (1) expressly stated that Transport had a duty to defend claims that were not within the coverage of the underlying insurance but were within the coverage of the Transport policy. That policy stated that the duty to indemnify with respect to the umbrella coverage was limited to amounts in excess of the $100,000 retained limit, but did not state that the duty to defend such claims was limited by the retained limit in any manner. Absent such an express limitation on the duty to defend, we conclude that the duty to defend was not so limited.

*304 5. Horizontal Exhaustion

"Horizontal exhaustion" refers to the exhaustion of all insurance policies providing the same level of coverage. (Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra, 50 Cal.App.4th at p. 339.) Principles of horizontal exhaustion are inapplicable under clause (1) because Transport's duty to defend under that provision did not depend on the exhaustion of underlying insurance, as we have explained. To the extent that the trial court concluded to the contrary, it erred.

DISPOSITION
The petition is granted. Let a peremptory writ of mandate issue directing the trial court to vacate its order of April 9, 2009, and conduct further proceedings consistent with the views expressed in this opinion. Vulcan shall recover its costs in these appellate proceedings.
Klein, P. J., and Aldrich, J., concurred.
NOTES
[1] We have italicized certain provisions of the policy. We have done so for purposes of clarity and to highlight the policy language that is at the heart of our analysis of the rights and obligations of the parties.
[2] We will refer to these two numbered clauses, respectively, as clause (1) and clause (2).
[3] We will refer to the first lettered clause above as clause (a) and the second as clause (b).
[4] We judicially notice the complaint filed by Transport on January 31, 2005, in Los Angeles Superior Court case No. BC328022. (Evid. Code, § 452, subd. (d).)
[5] We judicially notice the complaint filed by First State Insurance Company and Nutmeg Insurance Company on June 28, 2006, in Los Angeles Superior Court case No. BC354664. (Evid. Code, § 452, subd. (d).)
[6] The "other insurance" provision expressly contemplated that the coverage provided under the Transport policy could be primary coverage (i.e., "primary, excess or contingent"). An "other insurance" clause necessarily presupposes the existence of coverage under the policy at the same level as some "other insurance." As the umbrella coverage was the only coverage that could be characterized as primary, the wording of this clause gives further support to our conclusion.
[7] The policy here expressly stated that Transport had a duty to defend "even if any of the allegations of the suit are groundless, false or fraudulent."
[8] Our holding that the existence of a duty to defend with respect to the umbrella coverage did not depend on the exhaustion of underlying insurance also compels the conclusion that the duty to defend under clause (1) did not depend on the exhaustion of any self-insured retentions in the underlying policies.
[9] In our view, a true "self-insured retention," as distinguished from a deductible, expressly limits the duty to indemnify to liability in excess of a specified amount and expressly precludes any duty to defend until the insured has actually paid the specified amount. (See Padilla Construction Co., Inc. v. Transportation Ins. Co. (2007) 150 Cal.App.4th 984, 993 [58 Cal.Rptr.3d 807].)
[10] Courts have held, in many contexts, that self-insurance is not insurance (or that a "self-insurer" is not an insurer). For example, Aerojet-General, supra, 17 Cal.4th at page 72 and footnote 20, noted that self-insurance in the form of a "fronting" policy is not insurance for purposes of equitable contribution. Chambi v. Regents of University of California (2002) 95 Cal.App.4th 822, 825-827 [116 Cal.Rptr.2d 50], held that a self-insured employer was not an insurer for purposes of the requirement under Business and Professions Code section 801 that an insurer obtain the insured's consent before settling certain claims. California Pacific Homes, Inc. v. Scottsdale Ins. Co. (1999) 70 Cal.App.4th 1187, 1193-1195 [83 Cal.Rptr.2d 328], held that self-insured retentions during the period of a continuous loss were not primary insurance that must be exhausted before the insurers could have a duty to indemnify. County of San Bernardino v. Pacific Indemnity Co. (1997) 56 Cal.App.4th 666, 689-691 [65 Cal.Rptr.2d 657], held that a self-insured county was not an insurer for purposes of the apportionment of defense costs. Truck Ins. Exchange v. Amoco Corp. (1995) 35 Cal.App.4th 814, 827-828 [41 Cal.Rptr.2d 551], held that the parent of a self-insured subsidiary was not an insurer for purposes of a contribution action by an insurer. Richardson v. GAB Business Services, Inc. (1984) 161 Cal.App.3d 519, 522-525 [207 Cal.Rptr. 519], held that a self-insured was not an insurer for purposes of unfair settlement practices liability. Metro U.S. Services, Inc. v. City of Los Angeles (1979) 96 Cal.App.3d 678, 681-684 [158 Cal.Rptr. 207], held that a self-insured city was not an automobile liability insurer for purposes of Insurance Code section 11580.9.