Filed 9/27/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| AMERICAN SAFETY INDEMNITY COMPANY, Plaintiff and Respondent, v. ADMIRAL INSURANCE COMPANY, Defendant and Appellant. | D061587 (Super. Ct. No. 37-2010-00092157-CU-IC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E.L. Strauss, Judge. Affirmed.

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Walsh McKean Furcolo and James T. Derfler for Defendant and Appellant.

Blau & Associates, David S. Blau and Ron L. Nelson for Plaintiff and Respondent.

In this case, we once again apply the well-established principle that any limitation on the coverage provided by a liability insurance policy must be express and consistent with the reasonable expectations of the insured.

Here, the subject commercial general liability policy has a provision labeled "Self-insured Retention (SIR)" that clearly makes the insured liable for the first $250,000 in damages payable to any third party claimant. The policy also makes it clear the insured's payment of defense costs count toward meeting the insured's SIR obligations.

However, the SIR clause we are asked to consider does not expressly make payment of the SIR a condition of the insurer's broader obligation to provide a defense when an arguably covered claim is tendered. Rather, the SIR clause expressly applies only as a limitation on the insurer's duty to indemnify the insured for covered damages for which the insured is found liable. Given the language of the policy, an insured could quite reasonably interpret it as providing a defense to arguably covered claims as soon as such claims are tendered and before any SIR has been paid. Thus, like the trial court, we find the defendant insurer in this equitable subrogation action had a duty to defend its insureds when large soil subsidence claims were made against them and without regard to the SIR provisions in their policies.

We recognize other liability insurance policies contain SIR clauses that expressly and unambiguously make payment of a SIR obligation a condition of any obligation under the policy, including any duty to defend. We also recognize those SIR provisions have been enforced according to their terms. The policy in dispute here, however, does not contain such an express condition on the defendant insurer's duty to defend.

Because the defendant insurer had a duty to defend its insureds, principles of equitable subrogation required that it reimburse the defense costs another insurer,

2

plaintiff herein, paid on behalf of the defendant's insureds in the course of the underlying subsidence litigation. Although the plaintiff insurer made the payments notwithstanding the fact the insureds were not covered under any policy the plaintiff issued, the circumstances under which the plaintiff made the payments did not impair the plaintiffs' right to equitable subrogation.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Fessler Lawsuit & ASIC I*

This case and a related appeal we decided in 2009, *American Safety Indemnity Company v. Admiral Insurance Company* (Dec. 4, 2009, D053564) (nonpub. opn.) (*ASIC I*), grow out of the same underlying subsidence litigation and involve the same insureds and their insurers. We briefly summarized the underlying litigation in *ASIC I*:

"Between the late 1990's and 2002, Zephyr Newhall, LP, and its partner Zephyr Partners, LLC (collectively Zephyr), worked with developer D.R. Horton, Inc. [Los Angeles Holding Company; hereafter Holding], to build housing on a tract of land in Santa Clarita which Zephyr owned. [Holding] hired Ebensteiner Co. (Ebensteiner) to grade the tract pursuant to plans created by Leighton and Associates, Inc. (Leighton), a geological engineering firm. As part of their grading contract, Ebensteiner agreed to indemnify [Holding] against liability for any loss attributable to Ebensteiner's breach of duty even if [Holding's] conduct also contributed to the loss.

"The grading began in February 2002, but was not without incident. On or about March 11, 2002, a backcut slope failure occurred as a direct result of the grading, creating

3

a 140- by 100-foot landslide and tension cracks that visibly extended to within 50 feet of existing upslope homes. Another similar backcut slope failure, resulting in a 70- by 200-foot slide, occurred April 4, 2002.

"On or about April 15, 2002, several adjacent homeowners noticed physical damage to their property caused by the slides. On January 23, 2003, the homeowners sued [Holding], Ebensteiner, Zephyr and Leighton, among others (hereafter *Fessler* lawsuit). [¶] . . . [¶]

"At the time of the work, [Holding] was insured by defendant and respondent Admiral Insurance Company (Admiral), while Ebensteiner was insured by plaintiff and appellant American Safety Indemnity Co (ASIC). The respective policies limited coverage to $1 million per occurrence. The Admiral policy contained a provision which designated it 'excess' over the ASIC coverage; the ASIC policy contained a similar excess insurance disclaimer for those instances where the ASIC policy was not primary. The ASIC policy also covered [Holding] as an 'additional insured.'

"[Holding] tendered its defense of the *Fessler* claims to ASIC, which initially declined the tender. [Holding] then filed a bad-faith lawsuit against ASIC. On May 6, 2004, [Holding] and ASIC settled the bad-faith lawsuit. Under the terms of the settlement, ASIC agreed to pay [Holding's] defense costs and to not thereafter dispute its duty to defend [Holding].

"The Fessler lawsuit itself was settled on October 1, 2007. Ebensteiner agreed to pay the *Fessler* plaintiffs $2.52 million, [Holding] agreed to pay plaintiffs $1.75 million,

4

and Leighton agreed to pay plaintiffs $630,000, for a total sum of $4.9 million. Pursuant to the agreement, [Holding] and Ebensteiner dismissed with prejudice their cross-claims against one another, with the exception of claims either of their insurers had against the other's insurer. ASIC and Admiral each contributed their respective policy limits of $1 million to the settlement.

"While the *Fessler* lawsuit was pending, ASIC asked Admiral to contribute to the defense costs ASIC incurred on behalf of [Holding]. Admiral refused and ASIC filed [a declaratory relief action]. ASIC alleged Admiral was obligated to reimburse ASIC a pro rata share of the $2 million ASIC spent on [Holding's] defense. As we have indicated, ASIC and Admiral filed cross-motions for summary judgment.

"Among other matters, in opposing Admiral's motion, ASIC relied on expert and percipient witness deposition testimony that had been developed in the *Fessler* lawsuit. In particular, ASIC relied on two experts retained by the *Fessler* plaintiffs who concluded the slope failure was caused by defects in Leighton's grading plans and not by any deficiency in the grading performed by Ebensteiner. ASIC also relied on a geologist employed by Leighton who testified that, as far as he knew, Ebensteiner [ASIC's named insured] performed the grading according to Leighton's plans." (*ASIC I*, *supra*, D053564 [at pp 3-6].)

In *ASIC I*, Admiral argued the broad indemnity clause in the Ebensteiner grading subcontract protected both Holding and Admiral from any indemnity claim by Ebensteiner or ASIC. In *ASIC I*, we held that although the indemnity clause might

5

provide a complete defense to the claims ASIC was making, it would only do so upon a showing Ebensteiner was negligent. We found that the record did not establish Ebensteiner's negligence as a matter of law and reversed the summary judgment entered in Admiral's favor.

*B. ASIC II*

In addition to Holding, the Fessler plaintiffs also sued two Holding related entities, D.R. Horton, Inc. and D.R. Horton, Inc.—Los Angeles (collectively the Horton entities). The Horton entities had no contractual relationship with Ebensteiner, and Ebensteiner owed them no duty of indemnity; moreover, the Horton entities were not additional insureds on Ebensteiner's ASIC policy.

The Horton entities *were* named insureds under the Admiral policy.

Following Holding's bad faith lawsuit, ASIC paid the cost of not only Holding's defense in the Fessler lawsuit but also the cost of defending the Horton entities. All three entities were represented by the same law firm, which did not segregate its billings between the three. ASIC paid a total of $2,237,068.73 in defense costs on behalf of Holding and the two Horton entities.

After the Fessler litigation was settled, ASIC brought this separate declaratory relief action (*ASIC II*) against Admiral in which it sought reimbursement for the cost of defending the Horton entities. ASIC alleged substantive causes of action for subrogation, indemnity and contribution.

By way of an order granting ASIC's motion for summary adjudication, the trial

6

court determined that, as a matter of law, Admiral owed the Horton entities a duty to defend them in the Fessler action. In particular, the trial court determined that under the terms of the Admiral policy, although the SIR provision required that the Horton entities pay the first $250,000 in any damages recovered by a third party, Admiral's duty to defend the Horton entities was independent of the policy's SIR provisions.

At a later bench trial, ASIC presented a witness who testified to the defense costs paid by ASIC on behalf of Holding and the two Horton entities, and to statements made by representatives of the Horton entities that caused ASIC to conclude the Horton entities had no insurance coverage for the Fessler claims. ASIC also presented evidence that showed its settlement of the earlier Holding bad faith action did not include any provisions with respect to defense of the Horton entities.

Admiral did not present any witnesses.

In its statement of decision, the trial court determined ASIC paid defense costs on behalf of the Horton Entities, which were in fact Admiral's obligation, and was therefore entitled to subrogation for those costs. The trial court rejected Admiral's contention ASIC had acted as volunteer or had otherwise waived its right to reimbursement from Admiral. The trial court awarded ASIC a total of $1.9 million in reimbursement of the defenses costs it had paid and interest.

Admiral filed a timely notice of appeal.

7

DISCUSSION

I

"In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.] '"As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." [Citations.]' [Citation.]" (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291– 1292 (*Fireman's Fund*).)

"The essential elements of an insurer's cause of action for equitable subrogation are as follows: (a) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; (b) the claimed loss was one for which the insurer was *not* primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the act or omission

upon which the liability of the defendant depends; (g) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to the insured. [Citations.]" (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1292.)

"The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to '"stand in the shoes"' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. [Citations.]" (*Fireman's Fund*, *supra*, 65 Cal.App.4th at pp. 1292–1293.)

## II

In its principal argument on appeal, Admiral contends it owed the Horton entities no duty of defense and, hence, ASIC was not entitled to any subrogation because, contrary to the trial court's determination, the SIR provision in Admiral's policy applied not only to its duty to indemnify but also to its duty to defend.

We agree with the trial court. The SIR was not a condition of Admiral's duty to defend.

A. *Admiral's Policy*

The insuring clause in Admiral's policy states: "We will pay those sums that the

insured becomes legally obligated to pay as *damages* because of 'bodily injury' or 'property damage' to which this insurance applies. *We will have the right and duty to defend the insured against any 'suit' seeking those damages.* However, we will have no duty to defend the insured against any 'suit' seeking *damages* for 'bodily injury' or 'property damage' to which this insurance does not apply. . . ."  (Italics added.)

The Admiral policy contains the following definitions:

"17.  'Property damage' means:

"a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

"b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

"18.  'Suit' means a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged. . . ."

Admiral's duties are limited by an SIR endorsement to its policy, which provides in part:

"1.  *Our total liability for all damages* will not exceed the limits of liability as stated in the Declarations and will apply in excess of the insured's self-insured retention (the 'Retained Limit').  'Retained Limit' is the amount shown below, which you are obligated to pay, and *only includes damages otherwise payable under this policy*.

10

"If the 'Retained Limit' is subject to an annual aggregate, the aggregate amount shall be payable by the insured even if the policy is terminated prior to the expiration.

"'Retained Limit': [¶] . . . [¶]   $ 250,000 _____          Per Occurrence-Other than

                                                                                                        Products and Completed

                                                                                                        Operations

                                                   $ 250,000 _____          Per Occurrence-Products

                                                                                                        and Completed Operations

"2.  Expenses incurred under the SUPPLEMENTAL PAYMENTS-COVERAGES A AND B provisions of this policy are:

"[X]  Included in the 'Retained Limit,'  [¶] . . . [¶]

"4.  We have the right in all cases, at our expense, to assume charge of the defense and/or settlement of any claim wherein your liability is reasonably expected to exceed the Self-Insured Retention and, upon written request from us, you will tender such portion of the Self-Insured Retention as we may deem necessary to complete the settlement of such claim."

The policy Admiral provided the Horton entities is written on a "Commercial General Liability" form.  The face of the policy identifies it as providing *primary* coverage to its insureds.  The policy makes Admiral's coverage *excess* only when other coverage is available to its insureds by way of other insurance acquired by the insureds or when the insureds are named as additional insured on another party's policy. Significantly, when such other insurance is available and Admiral becomes an excess

11

insurer, the policy states:  "[W]e will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit'.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers."

B.  *Interpretation of SIR Endorsements*

The court in *Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677 (*Legacy Vulcan*) interpreted a policy that, like the Admiral policy, contained an SIR endorsement.  In *Legacy Vulcan*, the court held the SIR provisions only applied to the insurer's duty to indemnify its insured for damages, not its duty to defend.

Importantly, like the commercial general liability coverage Admiral provided to the Horton entities, the policy the court considered in *Legacy Vulcan* provided primary coverage rather than excess coverage.  (*Legacy Vulcan*, *supra*, 185 Cal.App.4th at pp. 695-696.)  The distinct roles played by primary and excess carriers are important.  As the court in *Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359 explained, a primary insurer typically charges a greater premium than an excess insurer, because the primary insurer will normally bear the cost of providing the insured with a defense. When a settlement or judgment exceeds the limits of the primary insurer's policy limits, the excess insurer will be required to contribute to the settlement or judgment but, typically, because a judgment or settlement ends the lawsuit, the excess carrier will not pay any of the insured's defense costs.  (*Id*. at p. 365.)

The court in *Legacy Vulcan* recognized that, given the different roles primary and

excess insurers play, there is a presumption an excess carrier has no obligation to pay defense costs until the underlying primary insurance has been exhausted or there is express policy language that imposes an earlier defense obligation on the excess carrier. (*Legacy Vulcan*, *supra*, 185 Cal.App.4th at p. 695.)  However, the court in *Legacy Vulcan* held that in the case of a primary policy with an SIR provision, the presumption with respect to defense costs, which operates in favor of an excess carrier, has no application: "One of the reasons for this rule is that the defense obligation falls on the primary insurer, whose greater premium reflects that risk.  [Citation.]  '[I]t is unnecessary to impose an immediate duty to defend on the excess carrier to afford the insured that to which it is entitled, namely, the full protection of a defense on its behalf.'  [Citation.]  Another reason for the rule is that, absent policy language to the contrary, the insured could have no reasonable expectation that an excess insurer would provide a defense before the primary insurance is exhausted.  [Citation.]

"These reasons, however, do not justify extending the rule that an excess insurer has no duty to defend unless the underlying primary insurance is exhausted to insurers who provide primary umbrella coverage with a self-insured retention, absent clear policy language so providing.  So-called "self-insurance" is no insurance and affords the insured no protection at all.  [Citation.]  To require the exhaustion of a self-insured retention before an insurer will have a duty to defend would not ensure that the defense obligation rests on the insurer receiving premiums for that risk, but instead would result in no insurer providing a defense prior to exhaustion.  Moreover, in the absence of clear policy

13

language so providing, to require the exhaustion of a self-insured retention before an insurer will have a duty to defend would be contrary to the reasonable expectations of the insured to be provided an immediate defense in connection with its primary coverage. If, under the terms of the policy, the insured would have a reasonable expectation that the insurer would provide a defense, any limitation on the insurer's defense obligation must be conspicuous, plain and clear. [Citations.]" (*Legacy Vulcan*, *supra*, 185 Cal.App.4th at pp. 695-696, fn. omitted.)

Because the policy it was considering did not expressly relieve the insurer of its duty to defend before the SIR was satisfied, the court in *Legacy Vulcan* held the insurer was obligated under its insuring clause to provide a defense when the underlying claim was tendered to it. (*Legacy Vulcan*, *supra*, 185 Cal.App.4th at p. 697.)

Contrary to Admiral's argument, we believe *Legacy Vulcan* was correctly decided. First, we note it is consistent with the general guidance the Supreme Court provided with respect to self-insurance in *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 75 (*Aerojet*). In *Aerojet*, the court held that an insured was not required to contribute defense costs attributable to periods during which it was effectively uninsured: "In a strict sense, 'self-insurance' is a 'misnomer.' [Citations.] 'Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.' (Ins. Code, § 22.) '[S]elf-insurance . . . is equivalent to no insurance . . . .' [Citation.] As such, it is 'repugnant to the [very] concept of insurance . . . .' [Citation.] If insurance requires an undertaking by one to indemnify

14

*another*, it cannot be satisfied by a self-contradictory undertaking by one to indemnify *oneself*."  (*Id.* at p. 72, fn. 20.)

The holding in *Legacy Vulcan* is also consistent with other cases that have analyzed particular SIR endorsements.  In *Montgomery Ward & Co. v. Imperial Casualty & Indemnity Co.* (2000) 81 Cal.App.4th 356 (*Montgomery Ward*), insurers argued that although the retained limits provisions of their respective policies did not specifically refer to defense costs, the retained limits requirements should have been interpreted as underlying insurance within the meaning of separate provisions that made the policies excess to other available insurance.  In rejecting this argument, the court stated:  "[A]ll of the policies make it clear there is a difference between underlying insurance and retained limits, and the Insurers understood this difference when they entered into these contracts. The Insurers now ask us to relieve them of this clear contractual obligation, and instead to deem retained limits in other potentially applicable policies to be primary insurance.  To do so, we would have to find Montgomery Ward's SIR's in all of its policies constitute 'other collectible insurance with any other insurer' . . . or 'specific valid and Collectible Underlying Insurances'. . . , as to which the Insurers' policies are excess.  This we will not do.  We are offered no public policy or other compelling reason to engraft new meaning on plain language, and accordingly 'we may not rewrite what [the insurers] themselves wrote.' [Citation.]"  (*Id.* at p. 367, fns. omitted.)

As the court in *Montgomery Ward* also noted, the cases that have required satisfaction of a retained limit as a condition of an insurer's duty to defend were, in fact,

15

not primary policies but in excess policies or involved express policy language that made both the duty to indemnify and the duty to defend subject to an SIR. (*Montgomery Ward*, *supra*, 81 Cal.App.4th at pp. 367-368; see, e.g., *Nabisco, Inc. v. Transport Indemnity Co.* (1983) 143 Cal.App.3d 831, 835 [policy language provided that insurance was excess to SIR]; *General Star Indemnity Co. v. Superior Court* (1996) 47 Cal.App.4th 1586, 1592 [same]; *City of Oxnard v. Twin City Fire Ins. Co.* (1995) 37 Cal.App.4th 1072, 1077-1078 [same].) "The significant point is that these cases, like all other insurance cases, look first to the terms of the policy. [Citation.]" (*Montgomery Ward*, *supra*, at p. 368.)

C. *Analysis*

Contrary to Admiral's argument, its policy does not expressly and unambiguously make its duty to defend the Horton entities subject to the SIR. Rather, the SIR endorsement expressly provides the contrary: "'Retained Limit' is the amount shown below, which you are obligated to pay, and *only includes damages otherwise payable under this policy*." In light of this unambiguous limitation on the scope of the SIR, it is not surprising that there is no other provision of the SIR that nonetheless extends the scope of the SIR to include the costs of defense.

Were there any doubt as to the scope of Admiral's SIR, we need only look to the policy's provisions with respect to other insurance. As in *Montgomery Ward*, the Admiral policy expressly provides that where a claim is covered by other insurance, the Admiral policy is excess and Admiral has no duty to defend. The absence of such an express extension of the scope of the SIR leads us, and would lead any reasonable

16

insured, to conclude that, consistent with the express terms of the SIR, the SIR only applies to damages.

In sum, the trial court did not err in determining the Horton entities were not required to satisfy the SIR as a condition of obtaining a defense from Admiral.

III

Admiral argues that even if it owed the Horton entities a duty to defend, ASIC either waived its right to subrogation or acted as a volunteer. Like the trial court, we reject these defenses as well.

A. *Settlement with Holding*

The trial court found ASIC's settlement of Holding's bad faith suit against it did not bar ASIC's later effort to obtain subrogation for defense costs it paid on behalf of the other Horton entities. The record supports the trial court's finding that by way of the settlement ASIC only agreed to provide defense costs to Holding and that it did not by way of the settlement forego its right to recoup those defense costs from other parties. In particular, nothing in the agreement itself or in the circumstances giving rise to it support Admiral's contention the defense costs ASIC paid were paid as "damages" for any act of bad faith on ASIC's part and therefore outside the scope of expenses that were rightfully Admiral's obligation.

We reject Admiral's reliance on *United Services Automobile Association v. Alaska Insurance Company* (2001) 94 Cal.App.4th 638, 646 (*USAA*). There, the excess carrier, USAA, sought subrogation against the primary insurer, New Hampshire, for damages

17

USAA paid the insured, Mrs. Thomas, in her bad faith action against USAA. New Hampshire in fact provided the insured with a defense and settled with the underlying personal injury claimaint within New Hampshire's policy limits. (*Id.* at p. 647.) Given these circumstances, we concluded USAA had no subrogation claim against New Hampshire for the USAA's own bad faith in failing to provide Mrs. Thomas with a timely defense. (*Ibid.*) We stated: "Because USAA, under the theory of equitable subrogation, stands in Mrs. Thomas's shoes and is entitled to recover from New Hampshire only what Mrs. Thomas could have recovered from New Hampshire, USAA's equitable subrogation claim rests on the untenable premise that Mrs. Thomas could have recovered compensation from New Hampshire for USAA's alleged wrongful denial of coverage." (*Ibid.*)

In ASIC's subrogation action, it stands in the shoes of the Horton entities. The Horton entities never made any bad faith claim against ASIC because there was no theory upon which ASIC owed the Horton entities any duty of defense: the Horton entities were not named insureds under the ASIC policy and were not additional insureds as a result of any contract with Ebensteiner. The Horton entities *were* named insured under the Admiral policy, and it is Admiral's unfulfilled defense obligations under that policy that gives rise to ASIC's subrogation claim. In short, unlike the circumstances we confronted in *USAA*, here, ASIC is in no sense seeking to recover subrogation for any wrong it committed.

18

B. *Volunteer*

Like the trial court, we also reject Admiral's contention that it voluntarily paid the Horton entities' defense costs.

The record shows that, notwithstanding requests from ASIC, the law firm defending Holding and the other Horton entities refused to provide ASIC with separate billing for each of the three entities. We also note the record shows and the trial court found that Admiral and Horton failed to disclose to ASIC the existence of the Admiral policies. Given these circumstances, the volunteer defense did not require that ASIC engage in further coverage litigation with Holding or the other Horton entities in order to preserve its rights against Admiral, which, as we have discussed, owed the Horton entities a duty of defense. In this regard, we note where, as here, one insurer has an otherwise valid subrogation claim against another insurer, the "volunteer" defense has been criticized: "'"[T]here are . . . compelling reasons for allowing recovery when the other insurer has not entered the case at all or has refused to defend the insured against suit by the injured party. . . . [T]his view represents the current trend and better rule in the 'volunteer' situations."'" [Citation.]" (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1290.)

DISPOSITION

The judgment is affirmed.  ASIC to recover its costs of appeal.


BENKE, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.