Filed 6/28/24  The Ganz Investment Co. v. Tam Partners CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE GANZ INVESTMENT CO., <br>     Plaintiff and Appellant, <br> v. <br> TAM PARTNERS, L.P., <br>     Defendant and Respondent. | A167175 <br><br> (Marin County <br> Super. Ct. No. CIV2002567) |

Appellant The Ganz Investment Company (Ganz) filed this action seeking a judicial dissolution of SOMA Partners, LLC (SOMA).  Ganz and respondent Tam Partners, L.P. (Tam) each held a 50 percent membership interest in SOMA, which owns real property in San Francisco.  The trial court stayed the dissolution to allow Tam to buy Ganz's interest under the procedure set forth in Corporations Code section 17707.03, subdivision (c).[1]  Several appraisals were presented to the court, and it selected one that valued Ganz's interest at $3,948,000.

On appeal, Ganz argues that (1) the buyout was precluded because SOMA already had been dissolved through a prior "event of dissolution," (2) the appraisal selected by the trial court was based on erroneous

_____

[1] Further undesignated statutory references are to the Corporations Code.

1

methodologies, and (3) revenues from the property received after the valuation date should have been divided by the court between the parties. We are unpersuaded by these arguments and affirm.

## I.  BACKGROUND

SOMA owns a single real property asset known as 201 8th Street in San Francisco.  In its request for a judicial dissolution, Ganz alleged that it was "not reasonably practicable to carry on the business of [SOMA] in conformity with the articles of organization or operating agreement" and management was "helplessly and irreconcilably deadlocked."

Shortly after Ganz filed its request for dissolution, Tam filed, and the trial court granted, a motion to stay the dissolution to allow Tam to buy Ganz's membership interest once its fair market value was determined.  Each party selected an appraiser, and the court ordered the retention of a third. After the appraisers submitted their initial reports, the trial court ordered them to meet and confer.  A supplemental report was subsequently filed.

Before the supplemental report was filed, Ganz moved to lift the stay and "extinguish" Tam's right to buy Ganz's interest.  Ganz argued that SOMA already had been dissolved by the terms of its operating agreement, and that this prior dissolution "trump[ed]" any buyout procedure and required SOMA to be wound down.

The trial court concluded that no such prior dissolution had occurred. Proceeding with the buyout procedure, it then selected one of the appraisers' reports that valued Ganz's interest at $3,948,000.  Ganz moved for reconsideration, but the court reaffirmed its prior order.

2

## II.  DISCUSSION

### A. *The Trial Court Properly Found that No Prior Event of Dissolution Occurred Under Section 17707.01.*

We begin by rejecting Ganz's argument that Tam was preempted from a buyout because SOMA had been dissolved through an "event of dissolution" set forth in its operating agreement.

### 1.  Additional Background

In 2009, Ganz and Tam executed an operating agreement (Agreement) "to provide for the governance of [SOMA] and the conduct of its business, and to specify their relative rights and obligations."  Section 1.18 of the Agreement defines the term "Managers" to mean "Robert D. Wolfe, as Trustee of the Robert D. Wolfe Living Trust ('Wolfe') and Gerald I. Ganz, as Trustee of the Ganz Family Trust ('Ganz'), until such time as their resignation or removal and the election of other persons or entities pursuant to the provisions of Article 5 of this Agreement."

Article 5 of the Agreement is entitled "Management" and describes the authority and power of the Managers to act on behalf of SOMA.  Section 5.1, subdivision (e) is entitled "Removal of Manager" and provides that a Manager "may not be removed except as expressly authorized in this Agreement."  It states that a Manager "may only be removed for cause by the Members upon one or more of the following" findings or determinations.  These include a "finding that the Manager has persistently and willfully disregarded his or her duties as a Manager," or a "written determination by two licensed physicians or by court order finding that an individual acting as Manager is incapacitated and unable to continue managing the business and affairs of the Company."  Section 5.1, subdivision (f) is entitled "Resignation of Manager" and provides that a Manager "may resign at any time and for any reason upon written notice to the Members."  Section 7.2, subdivision (a) of

3

the Agreement describes the voting rights of Members, and that any action requiring a vote "shall be taken only by unanimous Vote of the Members."

Section 9.1 of the Agreement is entitled "Events of Dissolution" and states that SOMA "shall be dissolved on the first to occur of the following events." One such event is the "resignation or removal of all of the Managers, when no replacement Managers are appointed."

In moving to lift the stay on the dissolution and to extinguish Tam's right to buy Ganz's interest, Ganz argued that SOMA was already dissolved under the Agreement's terms. Ganz stated that Gerald Ganz had died in December 2013, and that Robert Wolfe lacked capacity both in his own affairs (he had been appointed a guardian ad litem by the probate court) and to serve as Manager of SOMA. The trial court denied the motion, finding Ganz failed to show that any event of dissolution had occurred. It explained that section 9.1 of the Agreement was not triggered "when the Managers simply cease to serve for reasons other than resignation or removal," or "when a Manager is subject to removal by unanimous vote of the Members but has not actually been removed."

In its motion for reconsideration, Ganz represented that it had discovered new facts regarding Wolfe's incapacity, including an October 2022 probate court order appointing a temporary conservator for Wolfe. The trial court agreed this was a new fact warranting reconsideration, but it nonetheless affirmed its prior ruling. The court found Ganz had not only failed to show that Wolfe actually had been removed as a Manager, but it had also failed to show that the *other* Manager (Gerald Ganz) had resigned or had been removed. It therefore determined that Ganz had failed to show that there was an event of dissolution as set forth in section 9.1 of the Agreement, which requires that "all" the Managers had resigned or been removed.

4

**2. Analysis**

The statutory scheme governing judicial dissolution and buyout of an LLC is contained in the Revised Uniform Limited Liability Company Act (§ 17701.01 et seq) (RULLCA).  Section 17707.03, subdivision (a) provides that "a court of competent jurisdiction may decree the dissolution" of an LLC whenever certain events occur.  These events include those alleged in the operative complaint here:  that it is "not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement" or that management "is deadlocked or subject to internal dissension."  (*Id.*, subds. (b)(1), (b)(4).)

Section 17707.03, subdivision (c)(1) provides that a member of an LLC may "avoid" judicial dissolution by "purchasing for cash" the membership interest owned by the member who initiated the dissolution action.  But the availability of this buyout procedure is not absolute.  In *Friend of Camden, Inc. v. Brandt* (2002) 81 Cal.App.5th 1054 (*Friend of Camden*), the manager of an LLC sought judicial dissolution.  (*Id.* at p. 1060.)  Some other members filed a motion to stay the proceedings in order to ascertain the value of the manager's interest.  (*Ibid.*)  While that motion was pending, entities holding 50 percent of the membership interest voted to dissolve the LLC.  (*Id.* at p. 1061.)

Section 17707.01 provides that an LLC "is dissolved, and its activities shall be wound up," upon the happening of certain events.  These include "an event set forth in a written operating agreement or the articles of organization" or "the vote of 50 percent or more of the voting interests of the members of the [LLC] or a greater percentage of the voting interests of members as may be specified in the articles of organization, or a written operating agreement."  (*Id.*, subds. (a)–(b).)

5

*Friend of Camden* concluded that the vote to dissolve the LLC under section 17707.01 "extinguished the right defendants otherwise would have had" to buy out the manager's interest under section 17707.03. (*Friend of Camden*, *supra*, 81 Cal.App.5th at p. 1058.) It reasoned that the plain language of section 17707.01 states "unequivocally" that the LLC " 'is dissolved' " and its activities " 'shall be wound up' " if an event of dissolution occurs. (*Friend of Camden*, at p. 1063.) It explained that the "mere filing of the buyout motion" did not change this result, as the buyout procedure "did not begin until the court ordered the stay of the dissolution proceeding." (*Ibid.*)

Ganz relies on *Friend of Camden*'s conclusion that a dissolution under section 17707.01 "preempts" the buyout procedure under section 17707.03. Although we agree with this general principle, we disagree that it applies here. The question here is whether the status of SOMA's Managers constituted an "event of dissolution" under the terms of Agreement. This question is one of contract interpretation for which our review is de novo. (*Thee Aguila, Inc. v. Century Law Group, LLP* (2019) 37 Cal.App.5th 22, 27.)

"The rules governing the role of the court in interpreting a written instrument are well established." (*Wolf v. Walt Disney Pictures & Televisions* (2008) 162 Cal.App.4th 1107, 1125.) Our task is to "give effect to the mutual intention of the parties as it existed at the time of contracting." (Civ. Code, § 1636.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (*Id.*, § 1638.) "We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage." (*Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 688.) "We consider the contract as a whole and

6

interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation." (*Ibid.*)

The plain language of the Agreement is clear and unambiguous. Section 9.1 identifies an event of dissolution as the "resignation or removal of all of the Managers, when no replacement Managers are appointed." Section 5.1 specifies the procedure for such resignation ("upon written notice to the Members") and removal ("for cause by the Members"). Indeed, it states that a Manager "may not be removed except as expressly authorized in this Agreement." Section 7.2 of the Agreement also specifies that any action requiring a Member vote must be unanimous. Under these specific, defined procedures, neither Gerald Ganz nor Robert Wolfe resigned or were removed as Managers. Accordingly, no event of dissolution under section 9.1 of the Agreement occurred.

Ganz's arguments to the contrary are not persuasive. Ganz contends that the Managers had "effectively" resigned or been removed because Gerald Ganz died and Robert Wolfe became incapacitated, leaving SOMA without any "active" Managers. But there is nothing in the Agreement suggesting the parties intended that such events would amount to a dissolution. On the contrary, section 5.1 identifies the specific procedures for "resignation" and "removal," and includes narrowing language that a Manager "may not be removed except as expressly authorized in this Agreement."

Ganz contends that a "sensible" reading would include "death or incapacity" as an event of dissolution under section 9.1 of the Agreement. But we see no basis in the contractual language or the authority offered by Ganz to support such an interpretation. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) Here, the

7

Agreement contains the terms "death" and "incapacity" elsewhere: in section 8.4, subdivision (a) regarding events that trigger the option to purchase a Member's interest. The inclusion of these terms in another provision shows the parties could have added "death" and "incapacity" to section 9.1 (or section 5.1), but did not.[2]

Ganz also cites a "default rule" from RULLCA to argue that Gerald Ganz's death should be treated the same as resignation or removal. Section 17701.10 provides that an operating agreement governs certain aspects of an LLC, including its "activities" and the "conduct of those activities," but that RULLCA governs to the extent the operating agreement does not otherwise provide for such matters. (§ 17701.10, subds. (a)(3), (b).) Section 17704.07, subdivision (c)(5) then provides that a manager "may be chosen at any time by the consent of a majority of the members and remains a manager until a successor has been chosen, unless the manager at an earlier time resigns, is removed, or dies, or, in the case of a manager that is not an individual, terminates." Ganz contends that, because the Agreement "does not explicitly address what happens to a manager's position upon his death," section 17704.07 controls and Gerald Ganz's death was equivalent to a resignation or removal. But RULLCA states it does not apply where an operating agreement governs. (§ 17701.10, subd. (b).) As explained above, the Agreement here is explicit in specifying that an event of dissolution occurs upon "resignation or removal of all of the Managers, when no replacement Managers are appointed," and in identifying the procedures for such resignation and removal. Those procedures are not automatically completed

---

[2] We need not address Tam's reference to the term "death" in an earlier agreement between the parties regarding a different entity. Tam has not provided specific argument or supporting authority to read the two contracts together. (Cal. Rules of Court, rule 8.204(a)(1)(B); Civ. Code, § 1642.)

upon death of a Manager. Ganz cannot use section 17704.07 to force a contrary interpretation.[3]

Finally, Ganz argues that Robert Wolfe should be deemed resigned or removed so that Tam does not benefit from its failure to issue Wolfe's notice of resignation or its "willful and purposeful concealment of Robert Wolfe's incapacity" that "deprived Ganz of the information it would have needed in order to formally seek his removal." As a preliminary matter, we are unconvinced by Ganz's assertion that it was unaware of potential grounds to remove Wolfe before learning of the October 2022 temporary conservatorship order. In its complaint filed two years earlier, Ganz alleged that Wolfe was "not an active manager" of SOMA and was not "performing his manager responsibilities." The Agreement provides that a Manager may be removed for cause upon a finding that he or she "has persistently and willfully disregarded his or her duties as a Manager." But even assuming that Ganz was unaware of grounds to seek Wolfe's removal, Ganz still failed to show that the other Manager (Gerald Ganz) had resigned or been removed. As section 9.1 of the Agreement required "all" the Managers to have resigned or been removed with no replacement, no event of dissolution occurred.[4]

---

[3] In a footnote of its reply brief, Ganz also cites to section 192's definition of the term "vacancy" with respect to corporate boards. The argument is not properly presented and is not relevant to the interpretation of the Agreement. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

[4] Tam requests judicial notice of two court filings: (1) a declaration from another action referencing Wolfe's dementia to argue that his condition was "disclosed publicly," and (2) Ganz's petition for writ of supersedeas from this action to argue it "concede[d]" neither Manager had resigned or been replaced. We deny the request as not necessary to our analysis. (See Cal. Rules of Court, rule 8.252; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.)

The trial court did not err in determining there had been no event of dissolution under section 17707.01 that prevented it from moving forward with the buyout procedure under section 17707.03.

## B. The Trial Court's Selection of the Appraisal for Ganz's Membership Interest in SOMA Was Proper.

We next reject Ganz's argument that the trial court's selection of the appraisal regarding Ganz's membership interest was improper, because it relied on a valuation of SOMA's 201 8th Street property that contained erroneous methodologies.

### 1. Additional Background

Three experts were appointed to determine the fair market value of Ganz's membership in SOMA (as of December 29, 2020): Petra Loer (selected by Tam), Walter Ricci (selected by Ganz), and Jeff Stegner. Each of these appraisers submitted a report to the court. The reports had different valuations for the 201 8th Street property, but they all discussed the impacts and uncertainties created by the COVID-19 pandemic during late 2020.

Stegner valued Ganz's membership interest at $3,588,000. In reaching this conclusion, he relied on an appraisal by William Hersler of the 201 8th Street property at $7,950,000. Hersler explained that improvements to the property were originally constructed for industrial use in 1900 but currently used as a homeless shelter (since the 1980s). The property is fully leased

Moreover, we need not address Ganz's additional arguments regarding whether Wolfe's son was serving as a manager of SOMA because Ganz acknowledges these assertions were disavowed by Tam and rejected by the trial court. Any such assertions (or those regarding the appointment of new managers) made by Tam are not relevant here. Contrary to Ganz's suggestion, they are not "concessions" that Gerald Ganz and Robert Wolfe had resigned or been removed under the procedures set forth in the Agreement.

until 2025 and floor layouts contain "specialized buildouts" for the homeless shelter. There are two main open sleeping areas, a full industrial kitchen, showers and restrooms, as well as staff and counseling offices. Hersler concluded that the highest and best use of the property, as improved, is for "continued use of the existing homeless shelter, with the most likely alternate re-use potential for industrial uses." Stegner reached his ultimate valuation of Ganz's membership interest by adding SOMA's other assets with the appraised value of the 201 8th Street property, then applying discounts for lack of control and marketability.

Loer valued Ganz's membership interest at $2,849,000, based on an appraisal by Kane Duncan valuing the 201 8th Street property at $8,400,000. Loer agreed with Stenger that the highest and best use of the property is continued use as a homeless shelter. Loer also applied discounts for lack of control and marketability.

Ricci valued Ganz's membership interest at $7,345,000, having appraised the 201 8th Street property at $14,400,000. Unlike Stenger and Loer, Ricci concluded that the highest and best use of the property is to "demolish the existing improvements and develop a residential building over ground floor commercial to the maximum density allowed by zoning. Based on the subject's zoning and California State Density Bonus it has been determined that 125 units could be achieved." To determine the value of the property, Ricci identified redevelopment properties he deemed comparable. In his ultimate valuation of Ganz's membership interest, Ricci did not apply discounts for lack of control or marketability.

After receiving these reports, the trial court noted the different conclusions and felt it "prudent" for the appraisers to "review each other's reports and confer in an effort to arrive at a consensus of Ganz's interest, or

11

at least to narrow the gaps among their separate valuations." The court flagged concerns about "some of the appraisers' choices for sales comparables and other assumptions." For example, it found that one of properties identified by Ricci—a building that was sold vacant and fully entitled for development to 48 stories for $78 million—was not a "sufficiently relevant comparable" and "should not be used in further valuations."

A supplemental report was filed in September 2022. Ricci's valuation remain unchanged. Loer agreed with Stenger's smaller discount for lack of control, which adjusted her valuation up from $2,938,000 to $3,044,000. Stenger also adjusted his valuation up from $3,588,000 to $3,948,000, based on Hersler's indication that he would be willing to modify his appraisal of the 201 8th Street property from $7,950,000 to $8,800,000.

Hersler's valuation used an "income capitalization approach," because 201 8th Street was an income producing property able to be leased in the open market. Hersler originally calculated a market rent range of $24 to $30 per square foot, resulting in a valuation of $8,130,000. Hersler also analyzed the sales of properties he deemed comparable, resulting in a valuation of $7,950,000. Hersler reconciled these two numbers to arrive at $7,950,000.

In the supplemental report, Hersler concluded that a market rent rate "at or near the upper end" of his original range could be appropriate and consistent with the other appraisers (who had agreed on a $28 to $30 range). He also noted that his sales comparisons were taken from a period of limited transaction activity after the onset of the COVID-19 pandemic to reflect the "unique market environment existing at the time." Hersler concluded that a "greater upward adjustment" for the "inferior location" of these comparables "could be appropriate to consider."

Hersler, however, maintained his conclusion that the highest and best use of the property, as improved, was for continued use of the existing homeless shelter and that "the current underlying land value, less demolition costs, is not sufficient to warrant changing my conclusion." Hersler opined that Ricci's analysis was flawed because the redevelopment properties he used for comparison included (1) larger unit sizes than those for the 125 units assumed by Ricci at SOMA's property; (2) pricing from mid-2019, before COVID-19 impacted land values; and (3) entitlements that were not fully accounted for in their sales. Hersler also noted that, for the one property that was included in every appraisers' sales comparisons, Ricci made the highest positive adjustment for its location and was the only one who made no negative adjustment for its condition or quality.

While the appraisers still disagreed about whether redevelopment was the highest and best use of the property, the supplemental report reflected that they did agree on 102,092 square feet of gross building area as a reasonable size estimate of a potential new development. They also agreed that zoning did not directly specify the number of units allowed for a new development, but that the density bonus program (while requiring additional time and costs) would likely grant an increase in the base number of allowable units and provide additional height to accommodate bonus areas exceeding the zoned limit.

The trial court selected the Hersler/Stenger appraisal. It found the appraisal to be supported by the evidence, the discount percentages appropriate, and the value of the 201 8th Street property accurate. It stated that the discount for lack of marketability that was applied in the Duncan/Loer opinion was "too high given the facts at hand." The court found that Ricci's property valuation "relied on comps which the Court previously

noted were of concern and contained other assumptions which the Court found were not well supported." It found that Ricci's ultimate valuation, without applying any discount for lack of control or marketability, "did not accurately reflect the fair market value standard" and "was not supported by law."

### 2. Analysis

Section 17707.03, subdivision (c)(3) provides that, if the parties are unable to agree on the value of the membership interest for buyout, the trial court "shall appoint three disinterested appraisers to appraise the fair market value" and "make an order referring the matter to the appraisers so appointed for the purpose of ascertaining that value."

Appraisal proceedings are summary in nature. (*Abrams v. Abrams-Rubaloff & Assocs., Inc.* (1980) 114 Cal.App.3d 240, 248 (*Abrams*).) Once appraisal opinions have been submitted, the court is free to select among conflicting ones or decide the matter de novo. (*Cheng v. Coastal L.B. Associates, LLC* (2021) 69 Cal.App.5th 112, 119.) Here, the trial court determined that the Stenger opinion was supported by the evidence and the Hersler valuation of the 201 8th Street property was accurate. The parties disagree about the standard of review applicable to this determination: Ganz contends we should exercise our independent judgment, while Tam argues that the determination is supported by substantial evidence and should be affirmed.

Factual aspects of a fair value determination are reviewed under substantial evidence standard. (*Goles v. Sawhney* (2016) 5 Cal.App.5th 1014, 1018.) Ganz's two challenges to Hersler's "erroneous" methodologies—related to the density bonus law and sales comparisons—are factual in nature.

14

While we conclude that the substantial evidence standard applies, Ganz's arguments do not establish error under either standard.

The first purported flaw concerns the density bonus law relied on by Ricci to conclude that the highest and best use of the property was for residential redevelopment. [5] Ganz contends Hersler initially "ignored" this law and that, while he later "conceded" it applied, he did not amend his analysis.[6] But Hersler explained in the supplemental report that, while he had "revisited the potential of the subject for future residential redevelopment," the land value, less demolition costs, was "not sufficient to warrant changing [his] conclusion of [the] highest and best use, as improved."

Contrary to Ganz's suggestion, Hersler *did* explain his disagreement with Ricci's analysis. Hersler identified various issues with the redevelopment properties Ricci used for comparison, including larger unit sizes larger, pre-COVID pricing, and entitlements not fully accounted for. Hersler also showed that Ricci had made adjustments for the location, condition, and quality of comparables that were significantly different from the other appraisers and their research. Hersler concluded that Ricci's land

---

[5] The state density bonus law was designed to encourage municipalities to offer incentives to developers to "contribute significantly to the economic feasibility of lower income housing in proposed housing developments." (Gov. Code, § 65917.) A "density bonus" is defined as "a density increase over the otherwise maximum allowable gross residential density as of the date of application by the applicant to the [municipality]." (*Id.* § 65915, subd. (f).)

[6] We need not address Ganz's argument that the Duncan/Loer opinion improperly excluded the density bonus law because the trial court did not select that opinion. Nor do we accept Ganz's speculation that the trial court's criticism of the Ricci valuation "apparently" referred to his reliance on the density bonus law. And given all appraisers ultimately agreed the law would provide allowances for a potential redevelopment, we see no basis to claim any resulting error.

15

valuation was not supported by market data and omitted important considerations.

The second purported flaw raised by Ganz relates to Hersler's sales comparison approach. As a preliminary matter, we note that this argument does not address the other approach (income capitalization) Hersler used. In any event, Ganz argues that the sales comparison was flawed because it relied on the sales of industrial buildings zoned for industrial use, while the 201 8th Street property is zoned for mixed use. To support its position, Ganz cites a mandate related to county assessments under the Tax Code. (*Jones v. County of Los Angeles* (1981) 114 Cal.App.3d 999, 1004 [section 402.5 of the Tax Code mandates comparison land be subject to same use restrictions as parcel in question].) Ganz offers no authority to suggest that applies to a fair market value appraisal under section 17707.03. We decline to apply any such mandate here, particularly given the broad framework an appraiser has to determine the highest and best use of a property that is "legally permissible," "physically possible," "financially feasible" and "maximally productive." Here, Hersler looked at industrial properties as comparables to confirm that the highest and best use of 201 8th Street was for continued use as a homeless shelter, "with the most likely alternate re-use potential for industrial uses." These comparables were appropriate given that 201 8th Street "is currently used as a homeless shelter, in which specialized improvements have been installed in an industrial building."

Ganz also argues that the sales comparison was flawed because Hersler relied on buildings "in markedly different and inferior sections of San Francisco, such as the Bayview and Mission." But as detailed above, Hersler explained that there were limited available comparisons because he was looking at sales after the onset of the COVID-19 pandemic to reflect the

16

"unique market environment existing at the time." And while adjustments for location were included in his original valuation, Hersler acknowledged in the supplemental report that "a greater upward adjustment" for the inferior location of comparables could be appropriate and that he would be willing to increase his appraisal accordingly. In so doing, Hersler was accounting for "relevant legal, physical, and economic factors" in determining the highest and best use of the property. (Appraisal Foundation, *Uniform Stds. of Prof. Appraisal Practice* (2020-2021), cmt. to stds. rule 1-3(b), p. 18.)[7]

In sum, the trial court's determination that the Hersler valuation was accurate is supported by substantial evidence. The court did not err in selecting the Hersler/Stenger appraisal and confirming the value of Ganz's membership interest in SOMA to be $3,948,000.

## C. *The Trial Court Did Not Err in Declining to Divide Revenues from the Property After the Valuation Date.*

Lastly, we reject Ganz's argument that the trial court improperly failed to divide revenues from the 201 8th Street property after the valuation date.

### 1. Additional Background

Upon granting Tam's motion to stay the dissolution and commence appraisal of Ganz's membership interest, the trial court set the valuation date as December 29, 2020. Before selecting the Hersler/Stenger appraisal opinion, the court noted that neither party had brought a motion to designate some other valuation date, and thus it remained "set at December 29, 2020." The court confirmed the fair market value of Ganz's membership interest at

---

[7] We grant Ganz's request for judicial notice of the Preamble, Definitions, and Standard 1 from the Uniform Standards of Professional Appraisal Practice, which reflect "the current standards of the appraisal profession." (Evid. Code § 452, subd. (h).)

$3,948,000, and ordered Tam to complete purchase of the interest within 90 days.

As we previously mentioned, Ganz moved for reconsideration and the trial court reaffirmed its order. Ganz then moved to stay enforcement of the order pending appeal, and the court extended the buyout deadline to February 21, 2023, to consider the motion. The motion was ultimately denied. The court noted that a stay pending appeal "would allow Ganz to obstruct efforts to maintain and organize the LLC's assets and, in doing so, reduce the value of the membership interest." It also found Tam had made a "credible showing that Ganz seeks to prevent the consummation of the buyout so that it can prevent actions like necessary repairs, compliance with California law, etc., all in an effort to interfere with SOMA's orderly operation and damage the very asset that Tam is entitled to buy" and that "Ganz's pattern of disruption during this litigation weighs heavily against granting the requested stay."

On February 6, 2023, Tam filed an ex parte application for temporary restraining order. It alleged that Gerald Ganz's son had attempted to withdraw $1,167,437.84 out of SOMA's bank accounts and direct half of that amount to be distributed to Ganz and the other half to Tam. Ganz also filed an ex parte application to "preserve" its right to distribution of profits. Ganz alleged that the $1,167,437.84 amount represented rental income received by SOMA after the December 29, 2020 valuation date.

The trial court granted Tam's application and ordered Ganz not to withdraw, distribute, or disburse money from SOMA's accounts until after the buyout deadline. Ganz subsequently petitioned for writ of supersedeas, which this court denied.

18

## 2. Analysis

We begin with the parties' arguments regarding appealability. Ganz clarifies that its appeal is taken from the trial court's implicit denial of its ex parte application seeking distributions from SOMA after the valuation date, *not* the granting of Tam's temporary restraining order. Tam argues that this denial was not identified in Ganz's notice of appeal and is not appealable.

Ganz failed to provide a statement on appealability of the denial of its ex parte application. (Cal. Rules of Court, rule 8.204(a)(2)(B).) Ganz also concedes that the denial is not listed in its notice of appeal, but asks us to liberally construe the notice because it cites section 17707.03, subdivision (c)(3). Citation to the statute on buyout procedure—detailing the appointment of appraisers, court confirmation of appraisal, and decree for buyout within specified time or alternative dissolution of LLC—does not make it "reasonably clear" that Ganz appealed the denial of its ex parte application. (*Luz v. Lopes* (1960) 55 Cal.2d 54, 59.) Accordingly, the issue of whether the trial court properly divided revenues from the 201 8th Street property after the valuation date is not properly before us.

Even if it were, Ganz's arguments are not persuasive on their merits. Ganz's first contention, which we reject, is that SOMA revenues earned after December 29, 2020 "should have been included in the 'fair market value' of Ganz's membership interest" pursuant to section 17707.03. Section 17707.03, subdivision (b)(5) provides that the "valuation date" for the fair market value of a membership interest "shall be the date upon which the action for judicial dissolution was commenced." That was December 29, 2020, the date Ganz filed its complaint seeking judicial dissolution of SOMA. While section 17707.03, subdivision (b)(5) also provides that a court "may . . . designate some other date as the valuation date," it may do so only "upon the

19

hearing of a motion by any party, and for good cause shown." Here, neither party brought such a motion before the trial court confirmed the value of Ganz's membership interest.

Nothing in section 17707.03 suggests that the trial court was required to revise this valuation to account for revenues after the set valuation date. Ganz cites to *Keyes v. Hurlbert* (1941) 43 Cal.App.2d 497, but that case is inapposite because it dealt with an *option* to purchase an interest in a *general partnership*, not a buyout to avoid dissolution of an LLC. (*Id.* at pp. 499, 505 [surviving partners accountable to heirs and legatees of deceased partner for share of profits earned up to the purchase, where surviving partners delayed nine months before exercising their option to purchase the decedent's interest]). Here, section 17707.03 governs dissolution proceedings for an LLC, and it sets forth a buyout procedure that is consistent with the summary nature of such proceedings. (*Abrams*, *supra*, 114 Cal.App.3d at p. 248.) The statute avoids the delay tactic at issue in *Keyes* by requiring the court to specify the buyout deadline. (§ 17707.03, subd. (c)(3).)

Ganz also argues that the trial court wrongly "waived" Ganz's right to receive distributions after the valuation date. Again, we are not persuaded. Section 17704.04, subdivision (a) provides that any distributions made by an LLC "shall be among the members in accordance with the operating agreement." Accordingly, SOMA may have been permitted to make distributions after the valuation date. (See *Abrams*, *supra*, 114 Cal.App.3d at p. 250 [shareholder would "continue to enjoy" benefits accruing to him as shareholder until stock purchase, including receipt of any dividends].) But Ganz has offering nothing to show SOMA was *required* to make such distributions. Section 4.6, subdivision (a) of SOMA's Agreement states: "Except as otherwise provided in this Agreement, the timing and amount of

20

all distributions shall be determined by the Managers." Ganz does not suggest that the Managers made any determination to distribute revenues received after December 29, 2020. Instead, Ganz cites section 4.6, subdivision (c) of the Agreement to argue that it creates an exception requiring annual distributions and thus "supersedes" subdivision (a). But we read subdivision (c) to merely describe *who* receives distributions: that all distributions shall be made "to the persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made." In sum, the trial court did not err in denying Ganz's ex parte application seeking distributions from SOMA after the valuation date.

## III.  DISPOSITION

The judgment is affirmed. Tam is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____

Humes, P. J.


WE CONCUR:



_____

Banke, J.




_____

Siggins, J.*



*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Ganz Investment Co. v. Tam Investment Partners, L.P.* A167175